Nat H. Hentel, J.
Plaintiff seeks to recover $3,157 in damages to its books and machinery allegedly caused by defendant’s negligence. Plaintiff is the entire third floor tenant of one of defendant’s buildings. The negligence claimed is that defendant: “ allowed a certain hot water pipe on the fourth floor of the * * * premises to fail as a water conduit, to break and to have the water contents thereof flood onto the plaintiff’s property; [and that defendant] * * * failed and neglected to repair and replace excessively aged, damaged, corroded, and rusted pipes within said premises; which [defendant knew] or in the exercise of reasonable care should have known were about to *117 break, rupture and flood because of their age, manner of installation and condition in that over the years they caused, permitted, and allowed an excessive amount of moisture to accumulate around said pipe and its fittings which [defendant knew] or in the exercise of reasonable care .should have known was generative of accelerating rust and corrosion beyond that rust and corrosion caused by the normal and usual aging processes of such pipes * * * The plaintiff * * * will rely upon * * * the doctrine of res ipsa loquitur on the grounds that the defendant * * * had exercised exclusive maintenance and control over the defective, unsafe, rusted, corroded and damaged instrumentality which caused the damage to the plaintiff’s property. ”
At the trial, the office manager of the defendant’s fourth floor tenant testified that he had stayed late on March 9,1971, and that he left his office at about 7:00 p.m., and noticed a ‘ ‘ flood in the hallway coming from under the ladies’ room door.” He went into the ladies’ room and saw a leak coming from a wall. He called the police and they came in about 15 minutes. The police could not shut the water off; and the emergency police were called who came and shut off a valve in a wall,, behind a trapdoor, in the ladies’ room.
The office manager said he called the defendant’s office first but there was no answer. He did not call the building superintendent because that latter functionary was not in the building at that hour since he usually left the building about 3:00 or 4:00 p.m. There were no other usual employees of the defendant on the premises other than the superintendent. He also stated that during the year prior to this water-flooding incident, he had notified the superintendent and the defendant’s office secretary that the toilet in the men’s room had not been flushing properly; and the sink and urinal therein had on occasion run over. But, on March 9, 1971, when he had used the facilities of the men’s room, he had noticed nothing unusual in the operation of those facilities. He told the court that for a two-month period prior to the flooding, the water had run ‘ ‘ rusty ’ ’ when the sink in the men’s room had been used. He also said that the superintendent on several occasions, tried to fix the toilet facilities when they overflowed but the water still overflowed.
This same witness testified that on March 10,1971, a plumber came; a wall was ‘ ‘ knocked down ’ ’ in the ladies ’ room; work was done; and the leak was repaired. On cross-examination, the witness said that he never had made any complaints to defendant about leaks in the ladies’ room before this incident. It was only *118 the men’s room about which complaints had been registered. No repairs were made on March 10, 1971, to the men’s room; there had been no leakage from the men’s room the night of March 9, 1971. When this witness saw the leaking wall on March 9, he could not see any exposed pipe and could not tell where the leak was actually coming from at that time.
The plaintiff’s next witness was an insurance adjuster who stated he was at the scene on March 10, 1971; that he went to the fourth floor and interviewed the office manager, first witness, to determine the cause of the damage. He saw a plumber in the' hallway; but at that time the leak had been repaired. He did not speak to the plumber, nor did he speak to the defendant or superintendent about the leak. His testimony was contrary to the office manager’s testimony, at first, in that his recollection was that he was “ reasonably certain ” that the leak emanated from the men’s room and not the ladies’ room on the fourth floor which rooms shared a common wall. Later in his testimony, however, his written report was discussed which stated that the leak was in the ladies’ room wall.
Plaintiff’s president was next to testify, and he said that he arrived at his third-floor place of business about 9:05 a.m., March 10, 1971, and that Ms employees were ‘ ‘ mopping, shoveling water, and water was still dripping from the floor above.” On cross-examination, the president admitted he never had any complaints before this incident regarding water leakage from the floor above.
Next, Richard Zirinski, the defendant himself, was called by plaintiff as its own witness. He opined that the building he owned for the past five years was about 45 or 50 years old. He did not know the type of plumbing in the building, whether it was wrought iron or galvanized pipe but he knew it was not brass. He stated that he had no prior water damage in that building from defective pipes, and his roving engineer conducted a regular program for examining the pipes in all of the 20 loft buildings which he owned and operated at the time of this incident. His engineer would inspect each of his buildings every 10 days or so.
A bill from Chait Plumbers was introduced into evidence dated March 16, 1971, for repair of water leaks but it does not specify where the leaks were or the dates of leakage. He states that there had been no water leakage from the fourth to the third floor in the past five years, and that he did not know of any complaints about water problems in the plaintiff’s building. He learned about this incident on March 10, 1971, from an office employee. *119 According to the leases with the tenants in this building, tenants were required to repair any water leakage if the tenant caused the damage resulting in the leak. The fourth floor tenant had exclusive possession of the fourth floor as did-the plaintiff on the third floor.. He purchased the building vacant, and the present fourth floor tenant is the first tenant under his landlordship. Mr. Zirinski also stated that he never was required to replace any piping on the fourth floor prior to this incident.
The plaintiff called as its last witness the defendant’s roving engineer, Fred Burger, who supervised all repairs and made all inspections for the defendant. He stated that usually he was not invited into the tenants’ lofts, but only investigated conditions in the common systems servicing all tenants. He identified the pipe in the common wall between the fourth floor ladies’ and men’s rooms as galvanized pipe which rusts. He states he arrived at the building on March 10, 1971, at 8:30 a.m. on a regularly scheduled visit, and then it was that the superintendent told him of this leak — this was the first notice to him. He went to the fourth floor, and saw water flowing softly from a partition, from both sides; that he shut the valve in the men’s toilet although it covered a hot water line leading into a sink in the ladies’ room. He saw the water coming from the base of the wall. He directed the leak to be repaired, and had the wall opened up near where he estimated the leak to be coming from. He said that the person who discovered the leak could have prevented all the water damage by making a simple cardboard trough to divert the wall leakage into the open water floor drain in the ladies’ room. This had not been done!
Mr. Burger testified that “ every tenant has my night telephone number, including the police, but no one called me on the evening of March 9th.” He said the pipe in the wall was a %- inch feeder pipe and the leak was coming from where a %-inch leader pipe into the ladies’ room sink joined the % incher by an elbow joint. He did not see any pipe removed from the wall when the repairs were actually made on March 10. Such a leakage could be caused by undue pressure exerted on the leader pipe by anyone leaning on the sink, ’ ’ he said. Mr. Burger stated that the rust is not necessarily an indication that pipes are bad. To his knowledge, this was the first incident of water leakage in the building on the fourth floor. In his opinion, the pipes in the building were, on March 9, 1971, ‘ ‘ very good or in good condition ; and the fourth floor pipes are still in good condition now and are still in operation.” He saw no rusty water coming out of the pipes on March 10. He had received no complaints from *120 the fourth floor tenant in the year prior to the incident. He would receive all complaints. The only complaint he recalls, was to clean out a fourth floor urinal which is actually the tenant’s responsibility under its lease.
"When he was asked his expert opinion, he thought that galvanized pipe could be oxidized by chemicals in the water, and that corrosion could have caused the leak, or someone using the toilet on the fourth floor “ could have rapped the sink a shot, * * * a jar on the sink could cause a break ” in the elbow joint from, the feeder to the leader line. Also, in maintenance practice, generally, you leave “ well enough alone ” with respect to water lines, and if there is a leak, you investigate to see whether the whole system is bad. It is general practice to wait for a water leak before taking any maintenance action. He made no tests as to water pressure capabilities of the pipes in the subject building, stating: “ Why should I if it’s functioning properly?” He would only inspect exposed sprinkler and standpipe lines in tenant’s quarters when he was told there is a problem, and would inspect the common exposed water lines in the basement every two months. And pipes inside the walls would show the “ same kind of wear and tear as exhibited by exposed pipes, ” he concluded. Since March 10,1971, there have been no repairs to the hot water line involved.
This then was the plaintiff’s proof of the negligence of defendant. Plaintiff rested after its attorney stated that landlord’s plumber Chait had been subpoenaed to appear (the plumber who had made the March 10,1971 repairs), but Chait had not shown up at the trial. His absence was not otherwise explained. The defendant rested without calling any witnesses.
Under the well-established law pertaining to the required proof of negligence, of actual or constructive notice, and proof of a wrongful act or a wrongful failure to act, this court would dismiss the plaintiff’s complaint out-of-hand, upon the defendant’s end-of-trial motion, for failure to state a cause of action or to sustain plaintiff’s burden of proving negligence by a fair preponderance of the credible evidence. But the plaintiff has pleaded res ipsa loquitur in the absence of any other proof of defendant’s negligence. The court must now decide whether an inference of negligence raised by such a plea is overcome by all of the evidence, and whether defendant’s claim that the common toilet wall pipe involved, after all, is under the ¡exclusive control of the defendant, makes any difference.
Here, plaintiff has failed to prove any actual or constructive notice of any defect in the water pipes on the fourth floor which *121 defendant should have repaired; or, in the exercise of reasonable care, should have anticipated would become defective and thus have repaired it in advance. It is to be remembered that the fourth floor office manager called the police about the leak and not the defendant or his employees. (Cf. Ratomski v. Quittner, 214 App. Div. 186 [1st Dept.].) (Also, see, Weber v. Robro Realty Co. 53 N. Y. S. 2d 521.) Plaintiff has failed to prove any active or passive negligence on defendant’s part. There is no showing that there had been a leak from a pipe within a wall on the fourth floor before, or any warning of such at any time prior to the incident. Plaintiff introduced no expert testimony to the effect that rust or corrosion was the cause of the leak.' There is no showing that defendant ever repaired the offending pipe before this incident. There is np showing that a pipe burst. The leakage did not occur because of stopped-up toilets, urinals or sinks, as complained about during the year prior to the incident. In order to be charged with actual notice, the defective condition must be identical with prior incidents. There is no proof that the leak was caused by a rotted or corroded iron water supply pipe on the fourth floor. In other words, plaintiff relied solely on its res ipsa loquitur plea: — there being no other explanation of how the leak occurred, it must have occurred because of the defendant’s negligence since he was in sole and exclusive control of the building’s water supply lines.
The case of Speilman v. Zemach Corp. (N. Y. L. J., April 11, 1968, p. 13, col. 5, Sup. Ct., Kings County, Hart, J.), principally relied upon by plaintiff in its trial brief, is distinguishable from this cáse in that apparently there was actual notice of the defective condition in the Speilman case, and Mr. Justice Hart held: “ The corrosion and resulting deterioration was gradual and observable from <the exterior, and consequently defendant may be charged with constructive notice of the condition. ’ ’ (Emphasis supplied.) Here, plaintiff’s own witness Burger stated that he observed no rust, or corrosion, or deterioration on his regular biweekly inspections, and that the conditions observed of exposed pipe would apply equally to the condition of pipe hidden inside walls, in the absence of any other circumstances. It seems to the court that plaintiff is bound by its own proof. Here we have a hidden pipe, not observable from the exterior. The court cannot conclude here as did Judge Hart in the Speilman case (supra) that defendant was negligent “ in violating its duty of reasonable care in the maintenance of a general water supply pipe which serviced all the tenants. ’ ’ Where the pipe js uncovered and an accident involving water leakage occurs, the doctrine *122 6f res ipsa would be applicable. But, where the pipes “ were concealed ¡and opportunities for inspection would be limited ”, notice of a defect is essential to establish negligence. (Rindler & Weiler v. Blockton Realty Corp., 205 Misc. 355, 356; George Foltis, Inc. v. City of New York, 287 N. Y. 108, 115-116.)
Also plaintiff relies upon the case of Friedman v. 1016 Properties (N. Y. L. J., Aug. 2, 1972, p. 10, col. 7 [Civ. Ct., N. Y. County]) in which the court held the doctrine of res ipsa loquitur to apply where water damage occurs to a tenant’s premises from a source outside of the tenant’s premises. This, the court held, obviates the necessity to prove negligence or notice, whether actual or constructive, and a prima facie case of negligence is established casting upon the landlord the burden of coming forward with an explanation to rebut the inference of its negligence. To distinguish the Friedman case from this one: first, the landlord’s janitor left open a radiator pipe in the Friedmam case — a positive act; and second, there was no necessity here for defendant to come forward with an explanation to rebut the inference raised by the res ipsa plea, inasmuch as plaintiff’s own expert witness Burger testified that “ a shot to the sink could cause such a leak.” The rule of res ipsa “ will not apply where the accident could reasonably have resulted from any other cause.” (Rindler & Weiler v. Blockton Realty Corp., 205 Misc. 355, 356, supra.) The fourth floor tenant had the sole and exclusive use of the fourth floor. An ameliorating and counterbalancing inference can be drawn by the court that it was also possible an employee or business invitee of the fourth floor tenant could have placed undue pressure on the sink which, in turn, caused the leak.
The unpreponderant balance of proof in this case does not lend itself to the conclusion by this court that plaintiff sustained its real burden of proof. The doctrine of res ipsa helps its pleader overcome the initial burden of establishing a prima facie case, by raising an inference of negligence where damage is caused by an otherwise unexplainable circumstance. But the inference is rebuttable. Once, plaintiff rests, and defendant rests, then it becomes incumbent upon plaintiff to establish negligence not by inference but by a fair preponderance of the credible evidence. Here, plaintiff, in this court’s opinion, did not do so. It survived plaintiff’s case, but it did not survive the entire case. Plaintiff did not merely offer evidence of water leakage from a common water supply pipe contained within a wall without further explanation which would bring into play the res ipsa doctrine. Plaintiff went beyond establishing the circumstances of such water *123 leakage. It extracted from one of its own witnesses that the leakage could have been caused other than by mere continuing corrosion in which defendant acquiesced and did not seek to contain, prevent of forfend. No wonder defendant rested his case without offering any testimony or evidence to refute, contradict or rebut plaintiff’s inference of negligence. Defendant and his engineer had already given their testimony under oath as witnesses for the plaintiff binding the plaintiff to the content of their testimony.
If we are to accept plaintiff’s premise, defendant, in order not to be held liable for negligence, would have been required to replace all water supply pipes in the building merely because they were some 40 years of age without any further evidence that they were not functioning properly. What testimony was adduced to show galvanized pipe no longer to be serviceable after age 40? Even where there were minor leaks, this would still be an unreasonable duty for the court to impose upon a landlord. As a matter of fact, there was testimony by plaintiff’s witnesses that, when the landlord received notice of any problems with the plumbing, he made the necessary repairs.
It is well settled that the mere happening of an accident does not presuppose negligence. Likewise, an unusual occurrence resulting in damages to an innocent party does not necessarily, of itself, raise an inference of negligence on the part of the person charged with the performance of some duty. (Eaton v. New York Cent. & Hudson Riv. R. R. Co., 195 N. Y. 267.) Further, the circumstances must be such as to indicate negligence, and there must be more than mere speculation, guess, or surmise. (Ingersoll v. Liberty Bank of Buffalo, 278 N. Y. 1.) If the evidence, such as there is, is capable of an interpretation equally consistent with the presence or absence of a wrongful act, then the res ipsa doctrine cannot apply. (Manley v. New York Tel. Co., 303 N. Y. 18.) To apply the res ipsa doctrine, it must appear that the circumstances are such as to supply sufficient evidence of negligence without any further proof. (Galbraith v. Busch, 267 N. Y. 230.)
Res ipsa does not create a presumption of negligence as a matter of law. It merely raises an inference of negligence sufficient to establish a prima facie case. But when the whole case is done, plaintiff must still fulfill his burden of showing, by a fair preponderance of the credible evidence, that a duty owing by the defendant to the plaintiff was breached and that the negligence, if any, was the proximate cause of the injury. (Schaefer v. *124 De Neergaard, 196 App. Div. 654; see, also, George Foltis, Inc. v. City of New York, 287 N. Y. 108, 115, 118, supra.)
This, in the court’s opinion, plaintiff has failed to do. Judgment for defendant, accordingly. The complaint is dismissed.