GEORGE WASHINGTON UNIVERSITY, et al., Appellants,

v.

Alan WEINTRAUB, Appellee.

FRANK S. PHILLIPS, INC., Appellant,

v.

Noor HUSSAIN, Appellee.

Nos. 80–137, 80–394.

District of Columbia Court of Appeals.

Argued Nov. 13, 1980.

Decided Feb. 25, 1983.

Fred M. Vinson, Jr., Washington, D.C., with whom David S. Klontz, Washington, D.C., was on briefs, for appellants.

Alan Weintraub, pro se.

Noor Hussain, pro se.

Before MACK, FERREN and PRYOR, Associate Judges.

MACK, Associate Judge:

Appellants, a landlord and building manager, contend in these consolidated appeals that the trial court erred in allowing appellees, their tenants, to recover damage for losses arising from a flood in their apartment building. At issue is the scope of a landlord's duty to maintain rental premises in compliance with housing code regulations. Specifically appellants challenge the right of tenants-appellees to bring an affirmative cause of action for damages under the·circumstances of this case, the refusal of the trial court to bar recovery on the basis of an exculpatory clause in the rental contract, and the trial court's imposition of liability upon them for losses to appellees that resulted from an unforeseeable and unpreventable occurrence. We affirm in part, reverse in part, and remand in part.

I.

In October 1979 appellees were tenants at 2115 F Street, N.W., an apartment building owned by the George Washington University and managed by Frank Phillips, Inc., appellants. A clause in appellees' leases relieved appellants of liability "for loss of or damage to property of [t]enant caused by ... water ... that may leak into or flow from any part of said premises through any defects in the roof or plumbing, or from any other source."

On October 11, 1979, the tenants were notified that the water supply to the apartment building was to be temporarily disconnected while plumbing repairs were performed in a nearby building. Appellee Weintraub returned to his apartment after the water supply had been reconnected and found his unit flooded by water seeping through the ceiling. Appellee Hussain's apartment, located directly beneath Weintraub's unit, was flooded similarly. When the building janitor was located some twen-

ty to thirty minutes later, he determined that the water was coming from the apartment located directly above Weintraub's unit. The flood damaged appellees' personal property extensively and rendered their apartments uninhabitable for several days. Appellants authorized appellees to lodge at a nearby hotel at University expense until repairs were completed in approximately twelve days.

Appellees each filed suit against appellants seeking damages for losses arising from the flood, including reimbursement for hotel expenses and damage to their personal property. At trial appellants testified that no plumbing problems had come to their attention before this incident, that the plumbing at the premises was not defective, and that the October 11 flood had not damaged the plumbing.

The trial court considered appellees' claims [1] under two alternative theories of recovery, negligence and breach of the implied warranty of habitability. In analyzing the negligence claim the court reasoned that although appellants owed their tenants a duty of reasonable care under the circumstances, they were not required to foresee all possible dangers that might befall the person or property of appellees. The court distinguished cases in which landlords had been held liable to tenants on negligence theories [2] on the ground that there was "no evidence that the flood from Apartment 502 was more than a 'one time

thing,' and ... [appellants] were in [no] position to anticipate it." The court concluded that appellees "did not prove that any discrete negligent act or omission by the [appellants] was the proximate cause of [appellees'] damage" and denied recovery under the negligence theory.[3]

The court did, however, allow appellees to recover damages under the breach of warranty theory on the ground that the very condition of appellees' apartments under these circumstances breached this warranty and the contractual nature of the landlord's obligations under the warranty of habitability allows recovery independent of any proof that the landlord was negligent. The court held that

> once the tenant has established that his apartment is in a condition not compatible with the landlord's implied warranty of habitability and that he (the tenant) is not responsible, the burden shifts to the landlord to show that a third-party was responsible, that he (the landlord) has done all that he reasonably could to make the apartment habitable, and that the implied warranty has not been breached.

The court then considered two additional issues before determining the amount of damages to which appellees were entitled. First, the court noted that unlike the tenant in *Javins v. First National Realty Corp.*, 138 U.S. App.D.C. 369, 428 F.2d 1071, *cert. denied*, 400 U.S. 925, 91 S.Ct. 186, 27 L.Ed.2d 185 (1970) who sought an abatement in rent, appellees sought to use the warranty

---

1. The trial court did not issue an opinion in No. 80–394 but did certify that the parties' application for appeal and opposition thereto accurately characterized the facts, issues, and rulings below. *See* D.C.App.R. 6(d)(1). Because the facts, issues, and rulings outlined in these pleadings are substantially similar to those in No. 80–167 we dispose of both appeals together.

2. *Kanelos v. Kettler*, 132 U.S.App.D.C. 133, 406 F.2d 951 (1968); *Whetzel v. Jess Fisher Management Co.*, 108 U.S.App.D.C. 385, 282 F.2d 943 (1960).

3. Appellees contend on appeal that the trial court erred in ruling that appellants were not negligent because, based on the principle of *res ipsa loquitur*, the trial court should have in-

ferred negligence from the circumstances. We disagree. We have inferred negligence under this doctrine "[w]hen the cause of an injury is (1) known, (2) in the defendant's control, and (3) unlikely to do harm unless the person in control is negligent...." *Crump v. Browning*, 110 A.2d 695, 696 (D.C.1955). Appellees concede in their brief that the flood originated from a toilet in Apartment 502. Considering this fact and the trial court's conclusion that "[t]here was no evidence to show who was at fault in connection with the pressure on the valve which apparently caused the flood," we find no basis to conclude as a matter of law that the instrumentality that caused the damage in these cases was in appellants' control.

breach as the basis for an affirmative cause of action for damages. The court concluded that

the implied warranty of habitability may be used as a sword [as well as a shield]. In *Javins,* the Court of Appeals observed by way of dictum that "[i]n extending *all* contract remedies for breach to the parties to a lease, we include an action for specific performance of the landlord's implied warranty of habitability." 138 U.S. App.D.C. at 380, n. 61, 428 F.2d at 1082, n. 61 (emphasis added). Since . . . *Javins* authorizes specific performance in warranty of habitability cases, the "legal" remedy of damages must be available *a fortiori.*

The court also considered the effect of the lease clause quoted *supra* by which appellants purport to relieve themselves of liability for water damage. After weighing public policy considerations and the effect of § 2912 of the Housing Regulations of the District of Columbia the court concluded that "[i]nsofar as the lease in question purports to nullify the implied warranty of habitability which is imported into every rental agreement, it is ineffective as a matter of law . . . . [I]t appears that the very inclusion of the paragraph in the lease violates section 2912."

Finally, the court awarded damages to compensate appellees for expenses incurred in connection with occupancy of alternative housing following the flood and for personal property losses proximately caused by the flood. The court did not abate appellees' rent, however, finding that "[t]o award both an abatement and expenses would . . . constitute a double recovery under the particular circumstances of this case" (footnote omitted).

These appeals followed.

## II.

We affirm the trial court's "characteristically persuasive"[4] ruling that the implied

warranty of habitability "may be used as a sword (to collect damages) as well as a shield (to contest the obligation to pay rent)."

*Javins v. First National Realty Corp.,* supra, held that leases for residential housing in this jurisdiction include an implied warranty of habitability. "[B]y signing the lease the landlord [undertakes] a continuing obligation to the tenant to maintain the premises in accordance with all applicable law." *Id.,* 138 U.S.App.D.C. at 379, 428 F.2d at 1081. The court further held that to fulfill this warranty landlords are required to comply substantially with the Housing Regulations of the District of Columbia which provide, *inter alia,* that

[e]very premises . . . shall be maintained and kept in repair so as to provide decent living accommodations for the occupants. This part of the Code contemplates more than mere basic repairs and maintenance to keep out the elements; its purpose is to include repairs and maintenance designed to make a premises or neighborhood healthy and safe.

5G DCRR § 2501.

In *Javins* the Circuit Court, reasoning that "[t]oday's urban tenants, the vast majority of whom live in multiple dwelling houses, are interested, not in the land, but solely in 'a house suitable for occupation,'" *id.,* 138 U.S.App.D.C. at 376, 428 F.2d at 1078 (footnote omitted) (quoting *Ingalls v. Hobbs,* 156 Mass. 348, 31 N.E. 286 (1892)), held that "leases of urban dwelling units should be interpreted and construed like any other contract." *Id.,* 138 U.S.App.D.C. at 373, 428 F.2d at 1075 (footnote omitted). Applying these principles to the lease before it, the court conditioned the tenant's obligation to pay rent upon, *inter alia,* the landlord's fulfillment of the implied warranty of habitability. The tenant in *Javins* was, therefore, allowed to assert breach of the implied warranty as a defense to the

---

**4.** The trial judge used this phrase in describing the opinion, upon which he relied, of one of his colleagues.

landlord's suit for possession based on non-payment of rent.

■ The *Javins* court not only held that leases should be "interpreted and construed" as contracts, but indicated that all contract remedies, including specific performance, should be available in the event of a breach of the implied warranty. *Id.,* 138 U.S.App.D.C. at 380 n. 61, 428 F.2d at 1082 n. 61. It is well established in contract law that, in the event of total breach, a party may elect to terminate the contract or, in the alternative, use the contract to sue for damages. 11 WILLISTON ON CONTRACTS § 1292 (3d ed. 1968). Accordingly, we hold that a tenant may use breach of the implied warranty of habitability as the basis for an affirmative action for damages in this jurisdiction.[5] In so holding we follow a growing number of jurisdictions that have extended this remedy to tenants. *See, e.g., Jarrell v. Hartman,* 48 Ill.App.3d 985, 6 Ill.Dec. 812, 363 N.E.2d 626 (1977); *Mease v. Fox,* 200 N.W.2d 791 (Iowa 1972); *Boston Housing Authority v. Hemingway,* 363 Mass. 184, 293 N.E.2d 831 (1973); *Kline v. Burns,* 111 N.H. 87, 276 A.2d 248 (1971); *Berzito v. Gambino,* 63 N.J. 460, 308 A.2d 17 (1973); *Fair v. Negley,* 257 Pa.Super. 50, 390 A.2d 240 (1978); *Teller v. McCoy,* 253 S.E.2d 114 (W.Va.1979). *See also* Schoshinski, *American Law of Landlord and Tenant,* § 3:21 (1980).

### III.

■ We likewise affirm the trial court's ruling that the exculpatory clause in appellees' leases, which purports to relieve appellants of liability for personal property damage caused by any source (including defective roofing and plumbing) is ineffective to bar recovery in this case.

The Housing Regulations and *Javins, supra,* squarely impose upon the landlord the obligation to fulfill the implied warranty of habitability. The very public policy considerations which prompted the *Javins* court to introduce the implied warranty, inequality of bargaining power between landlord and tenant and the scarcity of housing, have persuaded other jurisdictions to hold that the warranty of habitability may not be waived by private agreement of parties to a lease. *See, e.g., South Austin Realty Association v. Sombright,* 47 Ill.App.3d 89, 5 Ill.Dec. 472, 361 N.E.2d 795 (1977); *Fair v. Negley, supra.*

> Were we to permit waiver of the implied warranty by an express provision in the lease, it would be a rare lease in which the waiver would not appear. As with the exculpatory clause, few, if any, tenants would be able to find housing on which the warranty had not been waived. To allow such wholesale, unbargained for waiver would make the implied warranty of habitability meaningless.

*Fair v. Negley, supra,* 257 Pa.Super. at 59, 390 A.2d 245.

We follow these jurisdictions and hold that the exculpatory clause at issue is ineffective to bar appellees' recovery insofar as it amounts to a waiver or modification of their rights under the implied warranty of habitability. *See* 5G DCRR § 2912; *Javins, supra* 138 U.S.App.D.C. at 378 n. 49, 380 n. 58, 428 F.2d at 1080 n. 49, 1082 n. 58.

### IV.

■ Our affirmance as to these specific rulings, however, does not dispose of the matter before us. While landlords clearly bear the burden of maintaining rented premises in compliance with housing code provisions, neither *Javins* and its progeny nor the Housing Regulations of the District of Columbia require that we impose upon landlords liability for losses arising from *all* conditions that violate the code. The Hous-

---

5. We note that more than *de minimis* violations of the Housing Regulations are required to establish breach of the implied warranty of habitability. The *Javins* court noted that "one or two minor violations standing alone which do not affect habitability are *de minimis* and would not entitle the tenant to a reduction in rent." 138 U.S.App.D.C. at 380 n. 63, 428 F.2d at 1082 n. 63. This principle would apply to claims for damages based on breach of the implied warranty of habitability.

ing Regulations do not impose immediate and unconditional liability upon a landlord for code violations but, instead, contemplate sanctions only if repairs are not effected after actual or constructive notice of the defect reaches the landlord.[6] *See* 5G DCRR § 2902.1(b).

In examining the scope of a landlord's obligations in the context of personal injury claims arising from allegedly unsafe housing conditions, we have noted that "the Housing Regulations impose only a duty of reasonable care upon owners of rental property." *See Scoggins v. Jude,* 419 A.2d 999, 1005 (D.C.1980). Similarly we have noted that "[a] landlord's duty of reasonable care does not require him to foresee all possible dangers." *Noble v. Worthy,* 378 A.2d 674, 677 (D.C.1977).

Appellees argue and the trial court found that liability for losses caused by conditions that violate the housing code and breach the implied warranty of habitability should be imposed without regard to whether a landlord has been negligent in maintaining the defective premises.[7] "[P]roof of negligence contravenes the whole idea of an implied warranty of habitability, which is a contractual obligation .... Proof of a breach of a contractual obligation is the sole requirement to establish ... liability." Appellees' Brief at 8. Appellees would have us impose on a landlord strict liability for such losses unless the landlord could establish that the tenant or a third party was responsible for the defective condition of the premises. Appellees would, in effect, render a landlord an insurer of his tenants' property.

We decline to adopt such a rigidly exclusive approach. We see nothing inherently inconsistent in a rule which conditions recovery under a theory alleging breach of the implied warranty of habitability upon a demonstration that the landlord has failed to exercise reasonable care to comply with the Housing Regulations and fulfill the implied warranty. As we have noted, "[l]iability for breach of warranty 'is a curious hybrid, born of the illicit intercourse of tort and contract ....'" *Berman v. Watergate West, Inc.,* 391 A.2d 1351, 1355 (D.C.1978), (quoting W. PROSSER, LAW OF TORTS § 95 at 634 (4th ed. 1971)). Accordingly, we follow those jurisdictions that condition recovery under a breach of warranty theory upon actual or constructive knowledge on the part of the landlord of the defective condition. Such notice need not be given by the tenant if the landlord, in the exercise of reasonable care, could have become aware of the defective condition.[8] *See, e.g., Keller-Loup Construction Co. v. Gerstner,* 476 P.2d 272 (Colo.App.1970) (allowing tenant to recover damages for personal property losses caused by burst hot water pipe on ground that landlord, who had exclusive control of heating system, failed to inspect and repair despite notice of defective condition of pipe); *Mease v. Fox, supra; Dwyer v. Skyline Apartments, Inc.,* 123 N.J.Super. 48, 301 A.2d 463, aff'd, 63 N.J. 577, 311 A.2d 1 (1973) (denying recovery to tenant injured by defective hot water faucet on the ground that, although landlord was obligated to maintain facilities under his control, landlord had no knowledge or reason to know of latent defect); *Pugh v. Holmes,* 486 Pa. 272,

---

6. Section 2902.1(b) of the Housing Regulations provides for the imposition of sanctions against a landlord if code violations arise after the inception of a tenancy which

> have not resulted from the intentional act or negligence of the tenant or his invitees, and which violations are not corrected within the time allowed therefor under a notice issued pursuant to these Regulations, or, if such notice has not been issued, within a reasonable time after the owner has knowledge or reasonably should have knowledge of such violations ....

7. Appellees have not abandoned their negligence theory, however. We reject the notion that the injury in these circumstances is one which evokes the doctrine of *res ipsa loquitur.* See note 3 *infra.*

8. The notice need not take the form of an official notice from municipal authorities. *See Javins, supra,* 138 U.S.App.D.C. at 380 n. 62, 428 F.2d at 1082 n. 62.

405 A.2d 897 (1979); *State Farm Fire & Casualty Co. v. Home Insurance Co.,* 88 Wis.2d 124, 276 N.W.2d 349 (1979) (allowing tenant to recover damages for personal property losses caused by frozen plumbing where landlord had notice of the defective condition that caused the damage). *See also* Schoshinski, *American Law of Landlord and Tenant,* § 3:24 (1980).

██ We hold that a landlord must exercise reasonable care to maintain rental premises in compliance with the housing code in order to fulfill the implied warranty of habitability. In setting this standard we contemplate that before a landlord may be held liable for breach of the warranty he must have notice, actual or constructive, of defective conditions that constitute a breach. A landlord who exercises reasonable care may not therefore properly be held liable to a tenant for losses that arise from defective conditions he neither knew of nor had reason to know about or that could not be foreseen or prevented.[9] The burden is upon the landlord to show lack of notice.

██ In the instant case there was testimony that there were no existing violations, that such flooding had never occurred before, that in reconnecting the water supply, according to accepted practice, the valves were handled carefully, and that subsequently plumbers had been unable to find any blockage or any damaged pipes. In-

deed the trial court found that "there is no evidence that the flood from Apartment 502 was more than a 'one time thing' and . . . the [appellants] were in [no] position to anticipate it." We conclude that appellants met their burden of proof with respect to lack of notice and that the court erred, therefore, in using a warranty of habitability theory to impose upon them liability for appellees' losses.

### V.

██ Based on our review of the record, however, we find that appellees may be, as a matter of law, entitled to damages on other grounds. Appellees' leases each included the following clause:

[I]f said premises become uninhabitable by reason of fire or other casualty not caused by the negligence of [t]enant, his servants or agents, the rental herein reserved shall be suspended until said premises shall have been restored to a habitable condition, nothing herein to be construed, however, as requiring [l]andlord to rebuild or restore said premises.

In its Opinion and Order the trial court found specifically that appellee Weintraub's apartment was uninhabitable. "[T]he critical issue is whether the apartment was habitable for the period following the flooding and before any corrective action. The Court finds that it was not."

---

**9.** In *Berman v. Watergate West, Inc., supra,* we discussed the use of products liability theories to recover damages from cooperative associations for defects in a cooperative unit, noting that " 'there is a liability imposed for injury caused by placing a defective product into the stream of commerce in the District of Columbia.' " *Id.,* 391 A.2d at 1357 (quoting *Cottom v. McGuire Funeral Service, Inc.,* 262 A.2d 807, 808–09 (D.C.1970)) (footnotes omitted). In this vein we observed "[t]here is reason to believe that a landlord could be held strictly liable for damages caused to a tenant by defective equipment. . . . [I]n some circumstances this liability might attach even though the landlord acquired the building subsequent to installation of the equipment." *Id.,* 391 A.2d at 1359 (citations omitted).

Because the trial court did not find that the plumbing in appellants' apartment building was defective, we do not rest our decision on this theory. Under appropriate circumstances, however, a landlord could be liable to tenants for damages caused by defective equipment on the ground that, in installing or failing to replace equipment that he knew or should have known to be defective, he placed into the "stream of commerce" an instrumentality likely to cause damage. The *Javins* court apparently contemplated this result, noting that "violations resulting from inadequate repairs or materials which disintegrate under normal use would not be assignable to the tenant." 138 U.S.App.D.C. at 380 n. 62, 428 F.2d at 1082 n. 62.

The exculpatory clause in appellees' leases would be ineffective to bar recovery if appellants were liable under this theory despite the disclaimer of liability for damage caused by defective equipment such as roofing and plumbing.

Accordingly, we remand these cases for findings as to the amount of damages to which appellee Weintraub is entitled, whether appellee Hussain's apartment was similarly uninhabitable, and, if so, the amount of damages to which he is entitled.

In calculating these damage awards, the court should compute the amount of rent which should be abated pursuant to this clause and subtract from this figure any compensation already accepted by appellees, for the trial court correctly held that compensation in the form of both an abatement and reimbursement for hotel expenses would constitute double recovery.

*So ordered.*

FERREN, Associate Judge, dissenting:

I respectfully dissent from three of this court's rulings.

The trial court, first, denied recovery for the landlord's alleged negligence. The court properly kept the burden of persuasion on the tenants but erred in declining to apply *res ipsa loquitur* on the tenants' behalf. All three tests for *res ipsa* were met: the flooding of the apartment, attributable to water pressure buildup in a valve, does not ordinarily occur in the absence of negligence; an instrumentality within the landlord's exclusive control—the valve apparatus in the plumbing system—apparently caused the flooding; and the tenants' actions were not a contributing factor. The tenants thereby established a prima facie case; thus, the trial court should have required the landlord to produce evidence rebutting the inference of negligence. Specifically, the landlord should have had to show that it could not have known of the defect in the exercise of reasonable care, or else run the risk of an adverse judgment. Accordingly, I would reverse and remand for reconsideration of alleged negligence, for on this record the landlord cannot be exonerated as a matter of law.

Second, in considering the warranty of habitability, the trial court did properly shift to the landlord the burden of producing evidence rebutting a manifest breach, but the court raised the hurdle too high. It imposed a burden "to show that a third party was responsible" instead of to show (as in the case of alleged negligence) that the landlord could not have known of the defect in the exercise of reasonable care. Therefore, although the trial court treated the landlord too lightly in considering negligence, it leaned on the landlord too heavily in evaluating the warranty. On this record, I also would reverse and remand for reconsideration of the alleged breach of warranty.

Finally, I do not agree with Part V. of the majority opinion remanding for consideration of damages under the clause in the lease covering uninhabitability "by reason of fire or other casualty." No party cited that clause to the trial court or to this court. The remand is gratuitous and thus inappropriate.

I.

In elaborating my conclusions, I find it helpful to show how the negligence and warranty theories interrelate.

We noted in *Scoggins v. Jude,* 419 A.2d 999 (D.C.1980), that housing regulations impose a duty of reasonable care, a breach of which can result in landlord liability for negligence. This means that a landlord has a duty to repair a defect (not attributable to the tenant)[1] that causes the premises to fall below code standards, RESTATEMENT (SECOND) OF PROPERTY § 5.5 (1977); and if the landlord "does not correct the situation within a reasonable time after being requested by the tenant to do so," *id.* § 5.4, the landlord will be liable for breach of the duty of reasonable care, *i.e.,* for negligence.

Two aspects of this analysis are important: liability for negligence cannot arise with respect to a defect until the landlord (1) receives notice of the defect and (2) has

---

1. A landlord's breach can be offset by the tenant's contributory negligence; the landlord is not strictly liable for injuries caused by code violations.

a "reasonable time" within which to make repairs. The exercise of reasonable care presupposes the time within which to do it. Thus, if a tenant informs the landlord about a leaky roof and it takes five days to repair a roof, there can be no breach of a duty to the tenant—no landlord's negligence—for the period of five days after notice. It follows that whatever remedies for negligence are available—rent abatement, damages to the leased premises and tenant possessions, and consequential damages for personal injury—they cannot be invoked (in my hypothetical) until after the fifth day, no matter what happens in the meantime. *Id.; see id.* §§ 10.2 (damages), 11.1 (rent abatement), 11.2 (application of rent to repair), 11.3 (rent withholding).[2]

But what happens, as in this case, when damage is attributable to a hidden cause or defect, and thus the tenant has not forewarned the landlord? Under the RESTATEMENT the same rule applies, but it is extended to incorporate constructive notice to the landlord:

> The landlord is subject to liability [in tort] under the rules of this section only for conditions of which he is aware, or of which he could have known in the exercise of reasonable care. Ordinarily, the landlord will be chargeable with notice of conditions which existed prior to the time that the tenant takes possession. Where the condition arises after the tenant takes possession, the landlord may not be able, in the exercise of reasonable care, to discover the condition, in which case the landlord will not be liable under the rules of this section until he has had a reasonable opportunity to remedy the condition after the tenant notifies him of it.

> Where the landlord is able to discover the condition by the exercise of reasonable care, he is subject to liability after he has had a reasonable opportunity to discover the condition and to remedy it.

*Id.* § 17.6, Comment c.

As to hidden defects, the question of a "reasonable opportunity to remedy" after notice often will be academic. As a practical matter, once a tenant takes possession, the trier probably will be hard pressed to find that the landlord had constructive notice of a hidden defect wholly within the tenant's domain (*i.e.,* the landlord probably will not have been "able to discover the condition by the exercise of reasonable care," *id.*). On the other hand, as to a defect in the premises before the tenant took possession, the trier probably will find that the landlord had constructive notice long before the injury occurred, and thus had more than "a reasonable opportunity to discover the condition and to remedy it." *Id.*[3] There is, however, a third situation where the RESTATEMENT's conditioning of liability on a reasonable period for repair after constructive notice of a defect may be critical to the landlord: the situation where the landlord retains control of a common area or facility after the tenant takes possession and thus the landlord retains continued exposure.

## II.

The foregoing negligence analysis, derived from a statutory duty to comply with housing codes, is premised on an express or implied warranty of habitability. *Id.,* § 17.6(2); *see Old Town Development Co. v. Langford,* Ind.App., 349 N.E.2d 744, 763–

---

**2.** In case of sudden destruction by a non-human force the tenant's only remedy is termination of the lease. RESTATEMENT, *supra* § 5.4.

**3.** Given the fact that the landlord ordinarily "will be chargeable with notice of conditions which existed prior to the time that the tenant takes possession," RESTATEMENT, *supra* § 17.6, Comment c, theoretically the landlord should be in default once the number of days had passed reasonably required to cure the defect after the first day of the tenancy. The RESTATE-

MENT, however, expresses the view that the landlord, even with such constructive notice, generally has no duty to repair until after the tenant makes a request, apparently on the ground that the tenant has waived the breach upon entry until the tenant gives notice. *See id.,* § 5.3. I do not find this waiver/request theory persuasive; I would find a landlord has constructive notice of defects existing at the inception of a tenancy.

64 (1976). That warranty is derived from a contract theory which does not incorporate a fault element. "Considerations of fault do not belong in an analysis of warranty." *Berman & Sons, Inc. v. Jefferson,* 379 Mass. 196, 200, 396 N.E.2d 981, 984 (1979); *accord Old Town Development Co., supra,* 349 N.E.2d at 767. Because a breach of warranty without regard to fault amounts to strict liability, there are two significant questions: (1) whether such liability is dependent on notice to the landlord, and (2) what kinds of relief are available.

The cases hold, as Judge MACK's opinion for the court points out, that actual or constructive notice is required to trigger warranty liability. *See id.,* 349 N.E.2d at 774–76; *Berman & Sons, Inc., supra* 379 Mass. at 202, 396 N.E.2d at 985–86. As a consequence, liability for negligence and for breach of warranty turn out to be virtually the same: the former for failure to use reasonable care to cure a known (or constructively known) defect, and the latter for breach of a convenant not to permit a known (or constructively known) defect.

In fact, the RESTATEMENT does not distinguish between negligence and warranty theories. Basically, they are merged in a set of rules recognizing a landlord's fundamental duty to maintain the condition of the property, called an "obligation of . . . repair," *id.,* § 5.5, a breach of which—as indicated earlier—is contingent on actual or constructive notice of the defect coupled with a reasonable time within which to make repairs.

Two deviations from this analysis should be noted. First, New York has adopted a policy of strict liability for breach of warranty of habitability, without regard to notice. *See Park West Management Corp. v.*

*Mitchell,* 47 N.Y.2d 316, 391 N.E.2d 1288, 418 N.Y.S.2d 310, *cert. denied,* 444 U.S. 992, 100 S.Ct. 523, 62 L.Ed.2d 421 (1979) (abatement); *Kaplan v. Coulston,* 85 Misc.2d 745, 381 N.Y.S.2d 634 (Civ.Ct.1976) (injury); *see also Krennerich v. WCG Investment Corp.,* 278 So.2d 842, 845 (La.App.1973). That is too harsh, as I see it.

Second, Massachusetts has said that the rent abatement remedy should be available to a tenant under the warranty of habitability theory immediately upon notice of the defect to the landlord, without deferral of the breach until after a reasonable repair period. *Berman & Sons, Inc., supra* 396 N.E.2d at 985–86.[4] The Massachusetts position makes sense:

> A dwelling afflicted with a substantial Sanitary Code violation is not habitable. The essential objective of the warranty is to make sure that the tenant receives what she is paying for. The tenant may not excuse her obligation with mere reasonable efforts to pay rent. Nor may the landlord avoid his duty with mere reasonable efforts to provide a habitable dwelling. The contract between the parties, seen through the law's clarifying lens, requires such symmetry.

\*     \*     \*     \*     \*     \*

Neither at the inception nor during the term of the lease did we leave room for a reasonable time to repair. Admittedly a tenant must notify her landlord of defects as a prerequisite to a rent abatement, but the purpose of this requirement is not to assure the landlord a reasonable time to repair. The requirement is designed to minimize the time the landlord is in breach and hence mitigate the permissible period of abatement of rent. The rent abatement begins when notice is

---

**4.** The Massachusetts Supreme Judicial Court left open the question of other remedies, including consequential damages for personal injury, during the pre-repair period immediately after notice. The Indiana Court of Appeals has announced that the full range of damage remedies will be available for breach of the implied warranty of habitability, but only after actual or constructive notice "and an opportunity to repair." *Old Town Development Co., supra,* 349 N.E.2d at 776. Specifically, "the tenant may recover (1) for all damages available under traditional remedies for breach of contract . . . including any consequential damages within *Hadley v. Baxendale* [9 Exch. 341] guidelines; and (2) for personal injury and personal property damage in tort under traditional negligence principles." *Id.,* 349 N.E.2d at 765, 774.

given, not at a reasonable time after notice. Time for repairs has no place in the calculus.

*Id.,* 396 N.E.2d at 985, 986 (footnotes omitted). In short, under the Massachusetts rule, immediately upon notice to the landlord of a breach of warranty of habitability, the tenant need only pay what the property is worth; the rent is abated to that extent. *Cf. William J. Davis, Inc. v. Slade,* 271 A.2d 412 (D.C.1970) (in case where housing code violations existed from outset of tenancy and were never remedied, tenant was responsible only for reasonable rental value of premises). Thus, if the apartment becomes uninhabitable, the tenant is obliged to pay no rent once the landlord has notice of the defect; a breach of warranty is not dependent on an additional grace period for repair.[5]

### III.

The difference in time between the attachment of liability under negligence theory and under the Massachusetts warranty theory—the five-day repair period in my earlier hypothetical—may be of minimal consequence when the only remedy at issue is rent abatement. The issue is magnified when we consider the availability of damages for injury to persons or property, since the repair-period interval after notice could make a real difference to the landlord, especially in cases concerning common areas or facilities over which the landlord retains control (and thus greater exposure) after commencement of the tenancy. See Part I. *supra.*

When we consider hidden defects, however, an even more significant issue than the availability of a repair period is presented: when shall a landlord be said to have constructive notice of a defect that will trigger liability for abatement of rent or, more significantly, for consequential damages?

The RESTATEMENT test, applicable under either negligence or warranty theory, is whether the landlord "could have known" of the condition "in the exercise of reasonable care." RESTATEMENT, *supra,* § 17.6, Comment c. The landlord, of course, will be deemed at all times to have notice of defects in common areas that he or she controls. *See* RESTATEMENT, *supra,* § 5.5(2). Moreover, as indicated earlier, the landlord traditionally has been chargeable with knowledge of all conditions existing at the time the tenant took possession, when the landlord was exclusively in control. *Id.* § 17.6, Comment c; *Old Town Development Co., supra,* 349 N.E.2d at 775–76. *But see* note 3 *supra.* In situations arising after the tenancy has begun, the constructive notice test is the same, but the landlord will have less of an opportunity to discover the defect, *see* RESTATEMENT, *supra,* § 17.6, Comment c, and thus will be less vulnerable to liability unless, as in the case of common areas, the landlord retains responsibility for, or access to, the area or facility where the defect arises.

The problem is, despite a nice theoretical difference between (1) landlord liability for hidden defects at the time the tenant entered the premises, which the landlord is deemed to know ("warranty of fitness"), and (2) liability for hidden defects that arise during the tenancy, which the landlord is deemed to know only if discoverable in the exercise of reasonable care ("duty of repair"), how can one tell when the hidden defect actually developed? If it developed after the tenant took possession, how can one tell whether it was discoverable by the landlord in the exercise of reasonable care? Given the difficulty of these questions, perhaps the really significant question is: who should have the burden of proof as to constructive notice, landlord or tenant?

In this case, under negligence theory the doctrine of *res ipsa loquitur*—if applica-

---

**5.** The Massachusetts rule reflects the theoretical difference between a breach of warranty and negligence summarized earlier in the text, *ante* at 52: a covenant not to permit defect, in contrast with a duty to cure a known defect (implying a reasonable time within which to do so).

ble—would keep the burden of persuasion on the tenant but require the landlord to come forward with evidence rebutting the "rational inference" that the landlord, because of its overall control of the plumbing system causing the injuries, must have been negligent. *Crump v. Browning,* 110 A.2d 695, 697 (D.C.1955) (*res ipsa loquitur* is a rational inference that relieves the plaintiff of the burden of showing specific acts of negligence). But while it is true that the landlord has overall control of the plumbing system, we cannot ignore the fact that individual tenants have access to that system (*e.g.,* sinks and toilets). Thus, the question more narrowly becomes: when an apartment-wide system such as plumbing is at issue and both landlord and tenant have access, will it ever be proper for the court, after hearing the tenant's evidence, to apply *res ipsa loquitur* (1) requiring the landlord to "produce information within his knowledge how the incident" that caused the injury occurred, *Krebs v. Corrigan,* 321 A.2d 558, 562 (D.C.1974), and (2) absent a satisfactory explanation, permitting the trier to infer that the landlord was negligent, despite the tenant's inability to show specific acts of negligence?[6]

The answer will be yes—*res ipsa loquitur* will be available to the plaintiff-tenant—if the injurious event meets three tests:

(1) the event must be of a kind which ordinarily does not occur in the absence of someone's negligence;

(2) it must be caused by an agency or instrumentality within the exclusive control of the defendant; and

(3) it must not have been due to any voluntary action or contribution on the part of the plaintiff.

*Sullivan v. Snyder,* 374 A.2d 866, 867–68 (D.C.1977) (quoting W. PROSSER, HANDBOOK OF THE LAW OF TORTS § 39, at 214 (4th ed. 1971)); *accord Quin v. George Washington University,* 407 A.2d 580, 583 (D.C.1979). When available, therefore, *res ipsa loquitur* will permit a tenant, who has limited access to information about the true nature of the event, to urge the trier of fact to draw two inferences from circumstantial evidence: that the accident more likely than not was the result of negligence, and the defendant-landlord was responsible. Absent satisfactory rebuttal evidence by the landlord, these inferences will be fairly drawn because, under the circumstances, the landlord will be in a substantially better position than the tenant to explain the cause of the injury, including the landlord's own lack of responsibility if that be the case. *See, e.g., Krebs, supra,* 321 A.2d at 561 ("superior, if not exclusive knowledge which defendants sometimes have as to the cause of accidents"); *Washington Sheraton Corp. v. Keeter,* 239 A.2d 620, 622 (D.C.1968) ("Defendant in control has a greater access to the instrumentality ... [and is] therefore in a better position to enlighten the trier of fact").

On the record here, the plaintiff-tenants should have had the benefit of *res ipsa loquitur. See generally* Annot., 91 A.L.R.3d 186 (1979). First, an apartment flood through the ceiling does not *ordinarily* occur in the absence of negligence. Although it is not clear whether the ultimate cause of the flood was negligence, I believe the trial court would have to find that such an event ordinarily would not occur without negligence on someone's part. *See, e.g., Powers v. Coates,* 203 A.2d 425, 428 (D.C.1964) (flooding of house due to frozen pipes is an event that would not ordinarily happen

---

**6.** It is important to note that even if the landlord's "explanation is unsatisfactory or indeed even if no explanation is made, the jury is free to decline to draw an inference of negligence." *Krebs, supra,* 321 A.2d at 562. *Res ipsa loquitur* permits but does not compel the factfinder to infer negligence; it does not shift the burden of proof. *Aetna v. Walker,* 344 A.2d 218, 220 n. 5 (D.C.1975); *Lathon v. Hadley Memorial Hosp.,* 250 A.2d 548, 549 (D.C.1969). *Res ipsa*

*loquitur* permits the plaintiff to present the case to the jury and escape nonsuit. *United States Fidelity & Guar. Co. v. Doctor's Hosp.,* 265 A.2d 774, 775 (D.C.1970). In some cases, however, the inference of negligence may be so strong that the defendant may be compelled to answer or suffer a directed verdict (as where human body parts are found in chewing tobacco). W. PROSSER, HANDBOOK OF THE LAW OF TORTS § 39, at 229 (4th ed. 1971).

"unless through negligence proper precaution is not taken to prevent it"); *Wardman v. Hanlon,* 52 App.D.C. 14, 280 F. 988, 992 (1922) (where scalding water from toilet tank pours out and burns plaintiff, the accident and the circumstances give "ground for a reasonable inference that, if due care had been employed, . . . the thing that happened amiss would not have happened"); *Juchert v. California Water Service Co.,* 16 Cal.2d 500, 514, 106 P.2d 886, 894 (1940) ("[I]t is a matter of common knowledge that in the ordinary course of things water mains do not break if those having the management thereof use proper care"); *Schon v. James,* 28 So.2d 531, 533 (La.App. 1946) (*res ipsa loquitur* applies where hot water heater leaks through second floor and floods first floor; "the burden is on the defendant to prove that the defect was latent and could not have been discovered by such careful examination as a reasonably prudent owner should give to such an appliance"); *Rindler & Wiler, Inc. v. Blockton Realty Corp.,* 205 Misc. 355, 357, 128 N.Y. S.2d 417, 419 (N.Y.Sup.Ct.1954) (where valve on water pipe in defendant's building breaks and water floods plaintiff-tenant's premises, "this kind of accident is within the rule [of *res ipsa loquitur*]"); *Washington v. Ravel,* 14 S.W.2d 367, 368 (Tex. Civ.App.1929) ("The flooding of a lower floor by water escaping from the upper floor through the ceiling is something that does not happen in the ordinary course of things if those in possession and control of the upper floor exercise proper care").[7] *But see Ford v. District of Columbia,* 190 A.2d 905, 907 (D.C.1963) (*res ipsa loquitur* did not apply where plaintiff offered no evidence as to probable cause of water main break but offered only the fact that the water main broke and damaged her property).

Second, the valve apparatus causing the flood was exclusively in the landlord's control.[8] "Exclusive control" is rigid terminology for what is actually a flexible concept. W. PROSSER, *supra* at 220. It does not necessarily mean that the defendant must be

---

**7.** I would not preclude the trial court from exercising its discretion, before sustaining the use of *res ipsa loquitur,* to require expert testimony when it does not appear that common knowledge and experience are sufficient to enable a lay person to determine whether the accident would—or would not—ordinarily occur without negligence. *See, e.g., Brizendine v. Nampa Meridian Irrigation Dist.,* 97 Idaho 580, 584, 548 P.2d 80, 85 (1976) ("[W]here common knowledge alone may not be sufficient to enable a layman to say" the accident would not ordinarily occur without negligence, "expert testimony may be admissible" to give foundation for trier to infer negligence; in this case it was entirely proper for the "trier of fact, reasoning from his common experience in light of the expert testimony," to conclude that canal would not ordinarily break without negligence).

If a plaintiff introduces evidence of specific acts of negligence (in contrast with expert testimony on the general question whether a particular injury would be likely to occur in the absence of negligence), he or she will be bound by such evidence. If, as a result, the evidence weakens the inference of negligence, the plaintiff in effect will have aided the defendant's effort either to argue *res ipsa loquitur* should not be invoked or, alternatively, to argue that it has rebutted plaintiff's prima facie case. *See Publishers Bookbindery, Inc. v. Zirinsky,* 73 Misc.2d 116, 123, 341 N.Y.S.2d 402, 410 (N.Y.

Civ.Ct.1973) (plaintiff lost its opportunity to avail itself of the *res ipsa* doctrine because it went beyond "merely offer[ing] evidence of water leakage from a common water supply pipe contained within a wall without further explanation which would bring into play the *res ipsa* doctrine").

**8.** My colleagues conclude that *res ipsa loquitur* is inapplicable because of appellees' concession "in their brief that the flood originated from a toilet in Apartment 502" and "the trial court's conclusion that '[t]here was no evidence to show who was at fault in connection with the pressure on the valve which apparently caused the flood.'" *Ante* at 45 n. 3. Nowhere in the record is there testimony that the flood originated from a toilet, but even if it did there is no implication, let alone evidence, that someone outside the landlord's control stuffed a toilet—which is the inference my colleagues appear to be drawing. The testimony of the landlord's property manager, Mr. Hart, is consistent with a finding that pressure built up elsewhere in the pipeline and forced a blockage (initially located somewhere else) out through pipes in the above apartment. The burden of his testimony, therefore, was that the landlord and its agents "were never able to determine" the cause of the damage, not an implication that an upstairs tenant must have jammed a toilet.

the only one with access to the instrumentality. *See Washington Sheraton Corp., supra,* 239· A.2d at 622 (*res ipsa loquitur* can be invoked in "joint control" cases "where the instrumentality causing injury is controlled ... by a single defendant and a third party"). Moreover, consistent with "exclusive control" is the possibility of an intervening cause that would preclude landlord liability. The point is, the landlord here had sole responsibility for system-wide maintenance, and thus in that significant sense had exclusive control, of the plumbing system. *See, e.g., Bankers Mutual Insurance Co. v. Friedlander,* 262 A.2d 606, 607 (D.C.1970); *Glaude v. Nash,* 46 A.2d 542, 543 (D.C.1946). It follows that, when pressure builds up in a valve over which the landlord has exclusive control and a pipe bursts causing damage in one or more apartments, it is reasonable to infer that the landlord's negligence caused the accident, absent a showing by the landlord that, in the exercise of reasonable care, it could not have known about the defect and responded in time to prevent the damage.[9]

Finally, to invoke *res ipsa loquitur,* the plaintiff-tenant must show that his or her own actions did not contribute to the injury. Appellees have met this burden.

Accordingly, I conclude the trial court erred in declining to find the landlord negligent without giving the tenants the benefit of *res ipsa loquitur.* Similarly, as to the warranty count, I agree with the trial court "that once the tenant has established that his apartment is in a condition not compatible with the landlord's implied warranty of

habitability and that he (the tenant) is not responsible, the burden [of producing rebuttal evidence] shifts to the landlord...." See note 9 *supra.* I do not agree, however, with the trial court's view that this burden requires the landlord "to show that a third party was responsible." See note 8 *supra.* The court shifts the burden too far. Given that the duty underlying both the negligence and warranty counts is virtually the same (see Parts I. and II. *supra* ), I conclude that the landlord, to defend against an alleged breach of warranty, need only produce evidence tending to prove that the landlord could not have known of the defect in the exercise of reasonable care.

### IV.

The present case, therefore, turns on whether appellants had constructive notice of a defect or, if they did not, when they received actual notice. The answer to these questions will determine whether landlords can be held legally responsible (1) for abatement of their tenants' rent during the period the apartments were uninhabitable and (2) for damages to the tenants' personal property.

Analytically, to resolve the case, I would:

1. Hold that landlord liability for negligence and for breach of warranty of habitability depends, first, on actual or constructive notice of the defect giving rise to damage.

2. Rule that constructive notice is defined as knowledge of conditions the landlord could have known about in the exercise of reasonable care.

---

**9.** In discussing burden of proof under the warranty of habitability, the trial court stated:

Whether this question is considered from the standpoint of legal principle or practicality, the result is the same: the burden must be placed on the landlord. His obligation having been to provide and maintain a habitable apartment, and the tenant having had nothing but a flooded one for almost two weeks, the landlord must surely come forward with some explanation as to why he could not provide what he had (perhaps involuntarily) warranted. This *is* especially *so* where, as here, the problem originated with equipment to which the landlord has access and the

tenant does not. From a practical standpoint, the landlord is, but the tenant is not, in a position to check valves, or deal with the Water Department, or inspect Apartment 502, or do any of the various things which *will help to establish what occurred.*

Given this persuasive reasoning, I do not understand why the trial court declined to invoke *res ipsa loquitur* and thus "draw an inference of negligence on the basis of this record." Perhaps the court's observation that the flood was a "one time thing" implied the court was skeptical that such floods, ordinarily, are attributable to negligence.

·

3. Hold that liability for negligence depends, in addition to notice, on the expiration of a reasonable repair period without repairs, and thus that neither rent abatement nor other damages will be available until the landlord has had a reasonable opportunity, after notice, to cure the defect.

4. Hold that, as in Massachusetts, liability for breach of warranty of habitability is triggered solely by actual or constructive notice of the defect; but, as in Indiana, see note 4 *supra,* the remedy is limited to rent abatement until the expiration of a reasonable repair period without repairs. At that point, other damages will become available.

5. Rule that the landlord, because of its system-wide control of the plumbing, must present evidence sufficient to rebut the inference from this record that the landlord knew, or in the exercise of reasonable care could have known, of the defect causing the injury. Otherwise, the landlord runs the risk of an adverse judgment on the basis of the tenant's prima facie case. It does not matter whether we use *res ipsa loquitur* and attach this argument to the negligence analysis, or simply say that, under both negligence and warranty theories, absent tenant responsibility for the injury this rebuttal burden is on the landlord when injury is attributable to plumbing, over which the landlord has system-wide control (*cf.* common areas).

6. It follows that, as to alleged negligence, the trial court erred in failing to require the landlord to come forward with evidence rebutting the inference of negligence. As to alleged breach of warranty, the court did properly shift the burden of producing rebuttal evidence to the landlord but shifted it too far, imposing a burden "to show that a third party was responsible" instead of to produce evidence tending to prove that the landlord could not have known of the defect in the exercise of reasonable care. Accordingly, reversal and remand are in order as to both the negligence and warranty of habitability counts unless, on this record, we can rule on the merits as a matter of law.

7. The trial court stated there was only "skimpy testimony produced at trial." It summarized the evidence:

On or about October 11, 1979, Weintraub's apartment was flooded as a result of a massive flow of water from Apartment 502, which is immediately above his own. His belongings were damaged, and he was compelled to leave his apartment for approximately twelve days.

\*   \*   \*   \*   \*   \*

The only witnesses were Weintraub and Gerald D. Hart, Phillips' property manager for the building in question, and the evidence before the Court as to the cause of the flooding is not exhaustive. Weintraub being a law student, his testimony was not atypical of its genre, and was interlaced with phrases like "in spite of the fact that" and other editorialized phraseology. Having no access to valves and pipes, Weintraub could provide little enlightenment as to what precipitated the mishap. Hart also had little first hand knowledge of the facts. It appears from the limited record available to the Court, substantially all of it hearsay, that the D.C. Water Department had temporarily turned off the water supply, that subsequently the water had been turned on again, and that some kind of blockage had developed in a valve which had built up water pressure in Apartment 502. Weintraub testified that he came home and saw that his apartment was being flooded from upstairs. He ran up to Apartment 502 and knocked on the door, but nobody was at home. He then looked for the resident manager and janitor, who could not be found for half an hour or so, even though it was the middle of the work day. Finally, he found the janitor and reported the problem. By that time, however, it was too late to rescue his belongings.

\*   \*   \*   \*   \*   \*

There was no evidence to show who was at fault in connection with the pressure on the valve which apparently caused the

flood in Apartment 502, which flood subsequently spilled over into Weintraub's apartment.

I do not believe we can say as a matter of law that the landlord met its burden to rebut the prima facie cases of negligence and breach of warranty. It is true, as the majority notes, *ante* at 45, that the trial court found "there is no evidence that the flood from Apartment 502 was any more than a 'one time thing,'" and that the court could not find "the defendants were in any position to anticipate it." The court made these statements, however, in the context of erroneously concluding that the plaintiff-tenants had not carried the burden of establishing negligence, without requiring the landlord to come forward with rebuttal evidence. When the court focused on the breach of warranty claim and placed the burden on the landlord, the result was quite different, although addressed to a greater burden than the landlord should have had to carry. See note 9 *supra*.

In sum, as to both the negligence and warranty counts, I would reverse and remand for the court (as the trier of fact) to determine whether the landlord produced sufficient evidence tending to show that it did not know, or in the exercise of reasonable care could not have known, of the defect in the plumbing system that caused the apartment to be uninhabitable and, as a consequence, damaged the tenants' personal possessions. If the court were to find the landlord's showing insufficient to rebut the inferences of negligence and/or breach of warranty, then it would properly order rent abatement as of the time the landlord had actual or constructive notice of the defect and order payment of the other damages, if any, after expiration of a reasonable period (from the date of notice) for making repairs.

## V.

Finally, as noted in my summary at the beginning, I do not agree with Part V. of the majority opinion remanding for assessment of damages under the so-called fire clause. That clause has never been a part of this case, at trial or on appeal, until my colleagues volunteered its applicability in the majority opinion.

## VI.

In conclusion, I urge a middle position, between the trial court's rulings on the merits of alleged negligence and breach of warranty. I cannot accept my colleagues' ruling as to the fire clause. Respectfully, therefore, as to three of this court's rulings I dissent.