Mildred WRIGHT, Appellant,

v.

Abraham HODGES, et al., Appellees.

No. 93–CV–1298.

District of Columbia Court of Appeals.

Argued April 11, 1995.

Decided July 26, 1996.

David J. Farber, Washington, DC, with whom Michael D. Esch and Ruth L. Ramsey were on the brief, for appellant.

Sunanda K. Holmes, Silver Spring, MD, for appellees.

Before WAGNER, Chief Judge, and STEADMAN and SCHWELB, Associate Judges.

Opinion for the court PER CURIAM.

Dissenting opinion by Associate Judge SCHWELB at 1106.

PER CURIAM:

This case concerns a landlord-tenant dispute regarding the conditions in an apartment in southeast Washington, D.C. Following a bench trial on the landlords' action for possession, the trial court entered judgment of possession in favor of the landlords, Abraham and Loretta Hodges, against the tenant, Mildred Wright. The court ruled that Mrs. Wright would be required to pay the Hodges the full amount of rent due in order to redeem her tenancy. On appeal, Mrs. Wright contends that the trial court erred in ruling for the Hodges because significant housing code violations allegedly existed on the premises, justifying her failure to pay the full rent due. She contends that the judge made inadequate findings of fact and that he applied incorrect legal standards to the evidence presented. We affirm.

## I.

On August 23, 1993, the Hodges filed an action for possession against Mrs. Wright, alleging non-payment of rent. Mrs. Wright defended on the ground that conditions in the apartment amounted to violations of the housing code.[1] The case came on for a bench trial on September 27, 1993. All parties appeared *pro se,*[2] and the court heard the testimony of Mrs. Wright, Mr. and Mrs. Hodges, and Carlos Adorno, a housing inspector employed by the District's Department of Consumer and Regulatory Affairs.

## A.

Mrs. Wright testified that she rented the apartment in question from Mrs. Hodges, an acquaintance of hers, in December 1991. The agreed upon monthly rent was $325. Mrs. Wright testified that in April 1993, she received notice from the Hodges that her rent would be raised to $375 per month. Mrs. Wright refused to pay the raised rent, contending that the apartment was in unacceptable condition and that no increase was warranted. Mrs. Wright claimed, *inter alia,* that her toilet and bathtub were backed up by sewage, that she had to pour water in the toilet to make it flush, that the exterior door locks were broken, that her ceiling leaked, that "all the light switches had electrical sensations in them," and that there were no lights on the outside of the building or in the hallway. She testified that some of these conditions, including the defective state of the toilet, existed when she moved into the unit, and that she had called Mrs. Hodges about these conditions immediately after moving in. According to Mrs. Wright, as of the date of trial, the backup in the toilet and bathtub still had not been fixed.[3]

## B.

The Hodges provided an account of the events in question which contradicted Mrs. Wright's version in a number of significant particulars. Mrs. Hodges denied that, upon

---

1. In addition, on August 27, 1993, Mrs. Wright filed a petition with the Rental Accommodations and Conversion Division, seeking a rent abatement of $401. While Mrs. Wright argues on appeal that the trial court erred in awarding the Hodges the full amount of rent due, no issue regarding the rent abatement petition as such is before us.

2. On appeal, however, the parties are represented by counsel.

3. Mrs. Wright also indicated that each of the other apartments in the building had been renovated to add a back room, but that her apartment still had a back porch instead of a back room. Mr. Hodges testified that Mrs. Wright's back porch was cluttered up with junk, so that "you can't even take two steps onto that porch." He claimed that he had repeatedly asked Mrs. Wright to move her things so that he could renovate that portion of the building, but that Mrs. Wright refused to do so. Commenting on the photographs which the parties had presented, the judge found that Mrs. Wright had cluttered up the enclosed porch with so many bags and items that "I don't know how you could pass through this room, either [to] get into it or get out of it."

moving in, Mrs. Wright had called her to complain about conditions in the apartment. The Hodges insisted, on the contrary, that Mrs. Wright's complaints were precipitated by the rent increase. Mr. Hodges testified that, in June 1993, "Mrs. Wright started calling all the housing inspectors . . . telling them all these violations that [were in] the apartment."

The housing inspector first visited the apartment on July 20, 1993. Mr. Hodges acknowledged that, on that occasion, the inspector found some violations, but Mr. Hodges testified that he corrected those violations "at that particular time." Mr. Hodges suggested that Mrs. Wright had intentionally caused some of the problems of which she was complaining. According to Mr. Hodges, on July 22, 1993, two days after his initial inspection of the apartment, the housing inspector found white paint in the sink, although nobody had been doing any painting in the building. Mr. Hodges also testified that, during the July 22 inspection, it was determined that Mrs. Wright "had taken the changer loose off the flusher so that the toilet wouldn't flush."

### C.

Housing inspector Carlos Adorno testified that on July 20, 1993, he inspected Mrs. Wright's apartment in response to a complaint of a sewage obstruction or leak. He testified that he found "emergency violations" as well as "numerous routine violations within the apartment." With respect to the emergency violations, Adorno stated that

> I did find a brown ring around the [kitchen] sink, but there was no obstruction. The lavatory and the bathtub did have some backup. I wasn't able to determine where that was coming from. There was a smoke [detector] that was defective in the

first mechanism as well. And the exterior entrance door locks, they were defective as well.

Adorno testified that he returned to the apartment on three separate occasions to check the status of the repairs and determined that all of the emergency items (as listed above) had been corrected by the time of his last inspection on August 2, 1993.[4]

Adorno testified that the "routine" violations which he found included "peeling paint, cracks in the ceiling, electrical outlet that was defective, windows that needed reputting and stuff like that, just your basic routine wear and tear." He explained that he had been scheduled to return to the unit in order to determine whether the routine violations had been abated, but that Mr. Hodges had received an extension to October 4, 1993 with respect to those violations.

### D.

At the conclusion of the evidence, the judge made oral findings of fact and conclusions of law. After outlining the history of the case and the testimony of the housing inspector, and indicating that he had examined the photographs submitted by the parties, the judge found that all of the emergency violations had been abated within thirty days. The judge then concluded that the Hodges had not "done anything wrong," and that "there has been no breach of the implied warranty of habitability here, and there is no defense to [not] paying the rent here." In addition, the judge noted that "the housing inspector is on top of this situation."[5] The judge ruled that, in order to redeem her tenancy,[6] Mrs. Wright would be required to pay the Hodges the full amount that the Hodges claimed was due on the rent. This appeal by Mrs. Wright followed.

---

4. On the occasion of Adorno's August 2 visit, Mrs. Wright complained that the kitchen sink was still obstructed. According to Adorno's testimony, he investigated and determined that someone had poured fresh white paint into the sink. (Mr. Hodges described these events as having occurred on July 22, 1993, rather than on August 2.) Adorno testified that the apartment was located at the top of a hill, and that "[t]here is no way you can get a sewage backup at that level."

5. Here, the judge was apparently referring to the as-yet unabated routine violations, with regard to which the Hodges had received an extension until October 4, 1993, shortly after the trial date.

6. See *Trans–Lux Radio City Corp. v. Service Parking Corp.*, 54 A.2d 144 (D.C.Mun.App.1947).

## II.

### A.

█ When a case is tried by the court sitting without a jury, the trial judge's "[f]indings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." Super. Ct. Civ. R. 52(a); *see* Super Ct. L & T R. 2 (making Civ. R. 52 applicable to proceedings in the Landlord and Tenant Branch). In determining whether the judge's findings are supported by the record, "we must consider the evidence in the light most favorable to [the Hodges], giving full play to the right of the judge, as the trier of fact, to determine credibility, weigh the evidence, and draw reasonable inferences." *In re T.M.*, 577 A.2d 1149, 1151 (D.C.1990) (citations omitted).

█ Under Super Ct. Civ. R. 52(a), the trial court in a nonjury case is required to "state sufficient findings of fact and conclusions of law to permit meaningful appellate review." *United States Fidelity and Guar. Co. v. Kaftarian*, 520 A.2d 297, 299 (D.C. 1987) (citation omitted). These findings must be "sufficient to indicate the factual basis for the ultimate conclusion." *Kelley v. Everglades Drainage District*, 319 U.S. 415, 422, 63 S.Ct. 1141, 1145, 87 L.Ed. 1485 (1943) (per curiam). "Where the trial court provides only conclusory findings, unsupported by subsidiary findings, or by an explication of the court's reasoning with respect to the relevant facts, a reviewing court simply is unable to determine whether or not those findings are clearly erroneous." *Kaftarian, supra*, 520 A.2d at 299–300 (internal quotation and citations omitted).

█ Nevertheless, a deficiency in factual findings does not always constitute reversible error. We will uphold the trial court's ruling against such a challenge, for example, "where the record clearly reflects the grounds of the trial court's decision," *Don't Tear it Down, Inc. v. District of Columbia*, 395 A.2d 388, 391 (D.C.1978) (citing *Warner Corp. v. Magazine Realty Co.*, 255 A.2d 479, 481 n. 4 (D.C.1969); other citation omitted),

or where the trial court's "decision is clearly supported by the record." *Simpson v. Lee*, 499 A.2d 889, 893 (D.C.1985) (citations omitted). Moreover, "we have often sustained rulings of the trial court on the basis of implied findings." *Battocchi v. Washington Hosp. Center*, 581 A.2d 759, 768 (D.C.1990). Finally, while "[f]indings of fact which result from a misapprehension as to the applicable law ... lose the insulation of the 'clearly erroneous' rule," *In re L.L.*, 653 A.2d 873, 880 (D.C.1995) (citation omitted), trial judges are presumed to know and apply the proper legal standards. *See, e.g., Walton v. Arizona*, 497 U.S. 639, 653, 110 S.Ct. 3047, 3057, 111 L.Ed.2d 511 (1990); *Hightower v. United States*, 117 U.S.App.D.C. 43, 46, 325 F.2d 616, 619 (1963), *cert. denied*, 384 U.S. 994, 86 S.Ct. 1903, 16 L.Ed.2d 1009 (1966).

### B.

█ In the District of Columbia, every lease for residential housing includes an implied warranty of habitability. *Javins v. First National Realty Corp.*, 138 U.S.App. D.C. 369, 380, 428 F.2d 1071, 1082, *cert. denied*, 400 U.S. 925, 91 S.Ct. 186, 27 L.Ed.2d 185 (1970); *George Washington Univ. v. Weintraub*, 458 A.2d 43, 46 (1983). "[T]o fulfill this warranty landlords are required to comply substantially with the Housing Regulations of the District of Columbia...." *Weintraub, supra*, 458 A.2d at 46. In order to establish a violation of the warranty of habitability, a tenant must show that any noncompliance with the housing regulations is more than *de minimis*. *Id.* at 47 n. 5. " '[O]ne or two minor violations standing alone which do not affect habitability are *de minimis* and would not entitle the tenant to a reduction in rent.' " *Id.* (quoting *Javins, supra*, 138 U.S.App.D.C. at 380 n. 63, 428 F.2d at 1082 n. 63).

█ "[A]pplication of the implied warranty is contingent upon the tenant's affording the landlord notice of defective conditions and a reasonable time within which to make repairs." Robert S. Schoshinksi, American Law of Landlord and Tenant § 3:16, at 127–28 (1980) (footnote omitted); *see also Weintraub, supra*, 458 A.2d at 49 (notice can be

actual or constructive and burden is on landlord to show lack thereof). "[T]enants are not entitled to an abatement when the landlord repairs the defective condition within a reasonable time after learning of its existence." *Chess v. Muhammad,* 179 N.J.Super. 75, 430 A.2d 928, 931 (N.J.Super.Ct.App.Div.1981); *see also id.,* 430 A.2d at 930 (collecting authorities).

### C.

■ Trial court judgments come to us with a presumption of correctness. *Cobb v. Standard Drug Co.,* 453 A.2d 110, 111 (D.C. 1982). We think that Mrs. Wright has failed to overcome this presumption, as well as the presumption that the trial judge knows and applies the proper legal standards. *See Walton, supra,* 497 U.S. at 653, 110 S.Ct. at 3057; *Hightower, supra,* 117 U.S.App.D.C. at 46, 325 F.2d at 619.

■ Although more detailed findings might have been preferable for purposes of appellate review, the trial court's express findings necessarily imply[7] that the court (1) credited the Hodges' testimony with regard to when they received notice of the defects; (2) found that the Hodges cured the emergency violations within a reasonable time[8]; and (3) found that the remaining routine violations,[9] which the housing inspector characterized as "just your basic routine wear and tear," were *de minimis* and did not entitle the tenant to a reduction in rent. Considering the evidence in the light most favorable to the Hodges, *see In re T.M., supra,* 577 A.2d at 1151, we cannot say that such findings are clearly erroneous. Moreover, they support the trial court's ruling that Mrs. Wright had no valid defense for her failure to pay the full rent due. *See Weintraub, supra,* 458 A.2d at 46–47 & n. 5; *Chess, supra,* 430 A.2d at 931.

7. *See Battocchi, supra,* 581 A.2d at 768.

8. The trial court specifically found that the emergency violations were abated within thirty days. The record reflects that the housing inspector found the emergency violations to be abated within thirteen days of his initial inspection. With regard to the alleged sewage backup, the trial court presumably credited the testimony of the inspector that "[t]here is no way that you can

Thus, in our judgment, "the record clearly reflects the grounds of the trial court's decision," *Don't Tear it Down, supra,* 395 A.2d at 391, and the trial court's ruling is "clearly supported by the record." *Simpson, supra,* 499 A.2d at 893. Accordingly, the judgment on appeal is

*Affirmed.*

SCHWELB, Associate Judge (dissenting):

In my opinion, the trial judge's findings in this case are not susceptible of meaningful appellate review. Accordingly, I would vacate the judgment and remand the case for further proceedings.

### I.

I think it important to emphasize, at the outset, that Mrs. Wright's allegations in this case are quite serious. If they are true, then she was compelled to live, for a considerable time, in conditions unsuitable for human habitation. Moreover, according to Mrs. Wright's testimony, the Hodges knew about at least some of these conditions from the beginning of the tenancy, but consciously and deliberately refused to do anything about them.

Mrs. Wright moved into the apartment in December 1991. Twenty-one months later, on September 27, 1993—the day on which this case was tried—Mrs. Wright testified that

> the sewer is still coming up in the toilet, as it was; the bathtub has still not been fixed; and the violations that I consider important to me, which is sewage, because I haven't eaten in that apartment since July, I haven't washed any dishes in there since July because it's unsafe and unsanitary. So I was told that if I was under such bad circumstances, that I should move out.

get a sewage backup at that level [where the apartment is located]," and that the only obstruction remaining in the sink on August 2 was white paint that someone had poured into it. *See supra* note 4.

9. As discussed above, *see supra* note 5, the deadline for correction of the routine violations had not yet passed on the date of trial.

But no one has any reason to live in the type of situation that exists in that whole building. . . .

Mrs. Wright further testified that she had brought the defective conditions to the attention of Mrs. Hodges immediately after she moved in. According to Mrs. Wright, however,

[Mrs. Hodges'] response was, well, Mrs. Wright, you know that you're not paying but X number of dollars, and if there's anything wrong, you should be able to do it [your]self.

Mrs. Wright thus alleged, in essence, that because the rent for her unit was modest, the Hodges consciously and deliberately gave her the Hobson's choice of either living with the violations or of making her own repairs as best she could.

Mrs. Wright was entitled to have these troubling allegations considered seriously and, I suggest, in some detail. It was the judge's obligation, in my view, to go beyond generalities and to make "a meaningful attempt to come to grips with the difficult factual issues raised by the record." *Eilers v. District of Columbia Bureau of Motor Vehicles Servs.*, 583 A.2d 677, 685 (D.C.1990). Rule 52(a) of the Superior Court's Civil Rules "means there must be findings on material issues. Failure to do so requires remand." *Tauber v. District of Columbia*, 511 A.2d 23, 28 (D.C.1986).

The judge did not, however, take up the specific factual issues raised by Mrs. Wright, nor did he directly address her credibility. Rather, he ruled in conclusory fashion that the Hodges had not "done anything wrong" and that there had been no breach of the implied warranty of habitability. The judge then completed his oral decision with a little homily which may have led Mrs. Wright to wonder how seriously her case was being taken:

I find that the housing inspector is on top of this situation, has been on top of this situation, is apparently going to continue to be on top of this situation since we all die—until we all die, and so I am—I take a lot of comfort in that, a lot of comfort that everybody is going to be looking out for everybody in this case.

For the reasons set forth below, this simply will not do.

## II.

Although the judge's focus at the bench trial was on the summer of 1993, when the inspector first examined the apartment, the most significant factual issue, in terms of relief to which Mrs. Wright might be entitled, related to events that substantially predated that summer. Mrs. Wright testified, as we have seen, that serious housing code violations existed from the day she moved into the unit, and that Mrs. Hodges deliberately refused to do anything about them and treated the tenancy, in effect, as an "as is" arrangement. Her testimony on these matters was very definite and very specific; it was either true or fabricated, but it could hardly have been the result of a mistake.

Mrs. Hodges denied, without elaboration, that Mrs. Wright had complained about conditions at the time that she moved in to the apartment. Mrs. Hodges, however, was not asked about, nor did she admit or deny, the alleged conversation in which she was said to have told Mrs. Wright that repairs were the tenant's own responsibility. The question whether Mrs. Hodges made the remarks which Mrs. Wright ascribed to her appears to me to hold the key to this case, and I do not see how the merits can be fairly determined without dealing with that question directly.

It is, of course, possible that Mrs. Wright was not telling the truth regarding the condition of the apartment at the beginning of the tenancy, and that she invented out of whole cloth the conversation in which Mrs. Hodges allegedly refused to do anything about the condition.[1] If Mrs. Wright did not fabricate her story, however, then she was entitled to some abatement for a year and a half or more, for the implied warranty of habitability cannot be waived. *Javins v. First Nat'l*

---

1. There is some limited implicit corroboration for parts of Mrs. Hodges' account, for the housing inspector did find numerous housing code violations when he examined the premises in 1993, several of them of an emergency nature.

*Realty Corp.*, 138 U.S.App.D.C. 369, 379–80, 428 F.2d 1071, 1081–82, *cert. denied,* 400 U.S. 925, 91 S.Ct. 186, 27 L.Ed.2d 185 (1970).

In his oral decision, the judge did not address at all the condition of the apartment during the first year and a half of Mrs. Wright's tenancy, nor did he mention Mrs. Hodges' alleged refusal to make repairs or the explanation that Mrs. Hodges allegedly gave Mrs. Wright for that refusal. The judge did not award Mrs. Wright any abatement, and I suppose that one could therefore infer that the judge "must have" disbelieved Mrs. Wright's testimony on these subjects, even though he did not say a word about it.

I suggest, however, that the decisive factual issue was far too specific and far too well-defined to warrant a disposition of it which would require the appellate court to guess at what the judge "must have" meant.[2] To hold, as my colleagues do, that findings as perfunctory as those which the judge made here "necessarily imply" that Mrs. Wright's account was false appears to me to eviscerate the principle, acknowledged by the majority, that the court must "state sufficient findings of fact and conclusions of law to permit meaningful appellate review." Maj. op. at 1105–1106 (quoting *United States Fidelity & Guar. Co. v. Kaftarian,* 520 A.2d 297, 299 (D.C.1987)). If it is enough for the judge to state that the landlords did not violate the implied warranty of habitability and did nothing wrong, then there is no incentive, *Kaftarian* and like cases notwithstanding, to address and resolve the hard factual issues on which the ultimate decision is based. My colleagues acknowledge that "more detailed findings might have been preferable." Maj. op. at 1107. I think they were essential.

Even if the judge disbelieved Mrs. Wright's testimony that she apprised Mrs.

Hodges in 1991 of serious housing code violations, the Hodges should at least arguably have known about some of the violations— *e.g.,* the defective condition of the exterior locks—because these defects may have been readily noticeable irrespective of whether Mrs. Wright complained. If Mrs. Wright had to live in an apartment which could not be locked, and if the Hodges knew or should have known about this circumstance, then the rental value of the premises was surely reduced at least in some measure. The judge made no finding directly addressing what the Hodges knew or should have known about the defective exterior door, or about any other violation.

### III.

Turning to the "routine" violations, the judge made no specific finding as to what they were, or how long they had existed, or when the Hodges knew or should have known about them, or whether they had been abated.[3] In fact, the judge denied Mrs. Wright any rent reduction, although it was undisputed that many non-emergency violations existed at the time of the inspection, and even though, at Mr. Hodges' request, the apartment had not been re-inspected between August 2, 1993 and the day of trial eight weeks later. *Cf. Novak v. Cox,* 538 A.2d 747, 751 (D.C.1988).

It may well be that the judge, after having examined photographs of the conditions complained of, viewed the non-emergency violations as "*de minimis.*" The housing inspector described them as "just your basic routine wear and tear." If that is what the judge intended, however, he made no such finding, explicitly or, in my view, even implicitly. Moreover, although "one or two" *de*

---

2. There is an additional reason to question whether the judge gave any consideration at all to the 1991 events. The alleged conversation between Mrs. Wright and Mrs. Hodges about repairs either occurred or did not occur. If it did not, then Mrs. Wright must have fabricated it. If the judge believed that Mrs. Wright was deliberately lying under oath, then I question whether he would have ended the trial with his ostensibly warm words about how glad he was that "everybody is going to be looking out for everybody in this case."

3. As the housing inspector explained, the Hodges had requested, and had been granted, an extension, and the premises were to be reinspected approximately one week after the trial. Accordingly, the judge could not and did not find, at the time he ruled in the Hodges' favor, that the violations had been abated. The pro se litigants did not ask the judge to keep the record open for evidence as to the results of the reinspection and, unfortunately, the judge did not do so *sua sponte.*

*minimis* violations would not entitle a tenant to a reduction in rent, *Javins, supra,* 138 U.S.App.D.C. at 380 n. 63, 428 F.2d at 1082 n. 63, there were numerous "routine" violations in Mrs. Wright's unit, and it is not at all clear to me that the words "one or two" in *Javins* can be so readily disregarded. Counsel for Mrs. Wright argue, not unreasonably, that "the extensive list of housing code violations written by the inspector ... amply portray[s] an apartment in far more severe shape than [one] suffering from 'routine wear and tear.'"

The record in this case establishes that there were numerous non-emergency housing code violations in the unit for a protracted period of time, and that they had not been abated at the time of trial. In my opinion, the trial judge did not adequately explain why, under these circumstances, no abatement was appropriate.

## IV.

The majority acknowledges that more detailed findings might have been preferable, but presumes "that the trial judge knows and applies the proper legal standards" and that "[t]rial court judgments come to us with a presumption of correctness." Maj. op. at 1107 (citations omitted). I do not challenge the existence of these presumptions, but I think that they have been amply rebutted in this case by the judge's own words. I agree with counsel for Mrs. Wright that

> *Javins* and its progeny do not stand for the proposition that rent will not be abated if a housing inspector "is on top of the situation" or will "continue to be on top of the situation." Nor do these cases support a ruling that the court may ignore housing code violations because they may be abated at some point in the future. Rather, the law of this jurisdiction requires that the court make some adjustment in the rent in failure to pay rent cases, when defendants like Ms. Wright counterclaim for a reduction of rent based upon [demonstrated and substantial] housing code violations. *Javins,* [138 U.S.App.D.C. at 380], 428 F.2d at 1082; *Winchester Management Corp. [v. Staten],* 361 A.2d 187, 190

(D.C.1976); *Hsu [v. Thomas],* 387 A.2d [588], 589 (D.C.1978); *Cooks [v. Fowler,* 147 U.S.App.D.C. 213, 213–14], 455 F.2d 1281, 1281–82 (1971).

To be sure, the trial judge found, with little elaboration, that the Hodges had not violated the implied warranty of habitability. If the trial judge actually applied to this case the legal principles implicit in his oral ruling, however, then the ultimate finding cannot be sustained. "Findings of fact which result from a misapprehension as to the applicable law ... lose the insulation of the 'clearly' erroneous rule." *In re Application of L.L.,* 653 A.2d 873, 880 (D.C.1995) (citation omitted).

For the foregoing reasons, I respectfully dissent.