*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters.  Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 22-CV-0556

SHANA LYNCH, APPELLANT,

V.

GHASSAN GHAIDA, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(2018-LTB-025721)

(Hon. Todd E. Edelman, Trial Judge)

(Submitted October 26, 2023                    Decided August 8, 2024)

*Joshua C. Toll*, *Matthew J. Washnock*, and *Kassandra L. Ashford* were on the brief for appellant.

Ghassan Ghaida, *pro se*.

Before EASTERLY and DEAHL, *Associate Judges*, and FISHER, *Senior Judge*.

FISHER, *Senior Judge*: This appeal arises from a dispute between a landlord and his tenant.  Appellee Ghassan Ghaida, the landlord, filed a complaint seeking to evict appellant Shana Lynch from his property and to collect unpaid rent.  Ms. Lynch counterclaimed, asserting that the property had severe housing code violations and that she was entitled to either full or partial abatement of rent.  After a bench trial,

the Superior Court held that Ms. Lynch was entitled to a 40 percent abatement, but that she still owed Mr. Ghaida $5,589 for unpaid rent. On appeal, Ms. Lynch challenges the court's calculation of the rent abatement and the judgment awarded against her. We remand for further consideration as explained below.

## I. Factual and Procedural Background

On June 20, 2018, the parties signed a one-year lease for a single-family home. Ms. Lynch was eager to move in although she knew that some repairs were still being made. Disputes soon arose over the condition of the property and Ms. Lynch's failure to pay rent, and on October 31, 2018, Mr. Ghaida filed his complaint seeking to evict Ms. Lynch. Ms. Lynch counterclaimed, as noted above. Before trial, Ms. Lynch relinquished the property to Mr. Ghaida, leaving money damages as the sole issue.

After evaluating the condition of the property, the trial court found several violations of the housing code. Nevertheless, it determined that the evidence presented by Ms. Lynch was insufficient to support the "findings necessary to void the lease in its entirety." We will provide more details in the legal analysis that follows.

Next, evaluating whether the landlord had breached the implied warranty of habitability, the trial court found that several housing code violations affected Ms. Lynch's use and enjoyment of the dwelling. First, the refrigerator was not cooling adequately and the oven did not work. Second, there was a lack of heat in the entire home as of November 2018. Third, there was damage to the ceiling and walls, including "significant, not merely cosmetic" holes and water damage. The trial court also found that, although there was evidence of a mouse infestation, there was no evidence of a problem with mice before Ms. Lynch's tenancy began, and she did not complain of mice until she had been living in the house for two months. Therefore, the court concluded that the infestation could not be attributed to Mr. Ghaida.

The trial court made additional findings regarding notice of the housing code violations and Mr. Ghaida's response. First, Ms. Lynch reported to Mr. Ghaida in August 2018 that the refrigerator and stove were not working, but he did not attempt to replace them until October 2018. When Mr. Ghaida attempted to deliver replacements, Ms. Lynch did not let Mr. Ghaida's agent into the house, and the agent left the appliances outside on the property. Second, Mr. Ghaida had "some notice" of heating issues from a 2016 order to vacate the same property issued by the Department of Consumer and Regulatory Affairs ("DCRA") to a previous tenant, and Ms. Lynch had notified Mr. Ghaida that the heat was not working in November

2018, but Mr. Ghaida did not repair the problem in a reasonable time and in a workmanlike manner. Third, Mr. Ghaida had notice of the holes and water damage at the time he rented the property, but he did not make repairs in a reasonable time and a workmanlike manner.

To determine the appropriate amount of rent abatement, the trial court evaluated how the housing code violations diminished the value of the property. The court found that the three violations were "fairly significant": kitchen appliances that did not work; large holes, cracks, and water damage in the walls and ceiling; and no heat during the winter months. The court then evaluated how long the violations were present. First, it noted that the kitchen appliances did not work for two months before the landlord attempted to deliver replacements. Second, it explained that the lack of heat has no effect on the value of the property in the summer months, but makes the property "unlivable" during the winter months. Considering these violations together with the damage to the walls and ceiling, the court determined that 40 percent abatement was appropriate.

The trial court then concluded that, because the rent established by the lease was $1,970 per month and Ms. Lynch occupied the premises for nine and a half months (until April 5, 2019), she would owe $18,715 without any rent abatement. Applying the 40 percent reduction, the court found that the amount of rent

Ms. Lynch owed Mr. Ghaida after abatement was $11,229. Given that Ms. Lynch made a security deposit of $1,700 and two $1,970 rent payments during her tenancy, the trial judge concluded that the amount of rent owed by Ms. Lynch and not yet paid was $5,589. The court entered judgment in favor of Mr. Ghaida for that amount.

## II.    Standard of Review

On appeal from a judgment entered after a bench trial, we review the trial court's legal conclusions de novo, "but defer to its factual findings if they are supported by the record." *Chibs v. Fisher*, 960 A.2d 588, 589 (D.C. 2008); *see* D.C. Code § 17-305(a) ("the judgment may not be set aside except for errors of law unless it appears that the judgment is plainly wrong or without evidence to support it"). Whether housing code violations existed and whether those violations affected the property's habitability are questions of fact to be submitted to the factfinder. *See Reese v. Diamond Hous. Corp.*, 259 A.2d 112, 113 (D.C. 1969). These findings of fact may be overturned only when "'the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (1985) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948), to define the term "clearly erroneous").

"Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Id.* at 574. "An appellate court will not redetermine the credibility of witnesses where, as here, the trial court had the opportunity to observe their demeanor and form a conclusion." *In re S.G.*, 581 A.2d 771, 775 (D.C. 1990) (quoting *WSM, Inc. v. Hilton*, 724 F.2d 1320, 1328 (8th Cir. 1984) (quotation marks omitted)).

Additionally, "[u]nder Super. Ct. Civ. R. 52(a), the trial court in a nonjury case is required to 'state sufficient findings of fact and conclusions of law to permit meaningful appellate review.'" *Wright v. Hodges*, 681 A.2d 1102, 1105 (D.C. 1996) (quoting *U.S. Fidelity and Guar. Co. v. Kaftarian*, 520 A.2d 297, 299 (D.C. 1987)). "Nevertheless, a deficiency in factual findings does not always constitute reversible error. We will uphold the trial court's ruling against such a challenge, for example, where the record clearly reflects the grounds of the trial court's decision, or where the trial court's decision is clearly supported by the record." *Id.* (citations and quotation marks omitted). "[W]e have often sustained rulings of the trial court on the basis of implied findings." *Id.* (quotation marks omitted).

Finally, the "judgment of any trial court is presumed to be valid. A losing party who notes an appeal from such a judgment bears the burden of convincing the appellate court that the trial court erred. In meeting that burden, it is appellant's duty

to present this court with a record sufficient to show affirmatively that error occurred." *Cobb v. Standard Drug Co.*, 453 A.2d 110, 111 (D.C. 1982) (citations and quotation marks omitted).

### III.   Analysis

Where the landlord has violated the housing code, a tenant may rely upon two different legal theories to avoid paying rent that otherwise would be due under the lease: that the lease was void or that the landlord breached the implied warranty of habitability. These theories "may be used as a sword (to collect damages) as well as a shield (to contest the obligation to pay rent)." *George Washington Univ. v. Weintraub*, 458 A.2d 43, 46 (D.C. 1983) (quotation marks omitted); *see also In re Stancil*, No. 01-02220, 2005 WL 3036647, at *24-29 (Bankr. D.C. Nov. 7, 2005).[1]

A lease is void as an "illegal contract" when there were unsafe or unsanitary conditions at the beginning of the tenancy due to violations of the housing code of which the owner had knowledge or reasonably should have had knowledge. *Brown v. Southall Realty Co.*, 237 A.2d 834, 836-37 (D.C. 1968); 14 D.C.M.R. § 302.1. A lease may also become void after the tenancy begins. 14 D.C.M.R. § 302.2. This

---

[1] We recognize that *In re Stancil* is not binding precedent, but we have found its analysis to be helpful in understanding this case.

occurs when housing code violations arise and render the unit unsafe or unsanitary, if they do not result from the intentional acts or negligence of the tenant, the landlord has knowledge or reasonably should have knowledge of them, and they are not corrected by the landlord within the time allowed by the housing regulations. *Id.*

The second theory relies upon the implied warranty of habitability. Implicit in all residential leases is an assurance that the housing supplied by the landlord will comply with the standards of habitability set out in the housing code. *Javins v. First Nat'l Realty Corp.*, 428 F.2d 1071, 1080-82 (D.C. Cir. 1970). Thus, a landlord breaches the lease contract when he does not substantially comply with the housing code. *Id.*; *see also Winchester Mgmt. Corp. v. Staten*, 361 A.2d 187, 190 (D.C. 1976) ("We define habitable housing as those dwelling units which substantially comply with the standards detailed in the Housing Regulations."). In order to "establish a violation of the warranty of habitability, a tenant must show that any noncompliance with the housing regulations is more than *de minimis*." *Wright*, 681 A.2d at 1105; *see also Shannon & Luchs Co. v. Jeter*, 469 A.2d 812, 816 (D.C. 1983) ("[I]n order to determine what amount of rent is owed, the tenant must be afforded the opportunity to prove housing code violations."); Standardized Civil Jury Instructions for the District of Columbia, No. 26.05 (rev. ed. 2023) (warranty of habitability;

tenant has the burden to prove a "substantial violation"[2] of the housing code).

There are two major differences between these theories. The first is that a tenant must demonstrate more significant violations of the housing code to void a lease than is necessary to prove a breach of the implied warranty. Voiding a lease requires proof of housing code violations that render the unit "unsafe" or "unsanitary," whereas a breach of the implied warranty occurs when violations are "more than *de minimis*." *Compare Brown*, 237 A.2d at 836 (requiring "unsafe and unsanitary" conditions to void a lease) *with Wright*, 681 A.2d at 1105 (requiring

---

[2] When the term "substantial violation" is used in the implied warranty of habitability setting, we understand it to mean a violation that is more than *de minimis*. For example, we used the term "substantial violation" in *Curry*, noting that "the landlord's breach of the warranty of habitability, as measured by substantial violations of the housing code, can be interposed by a tenant as a defense, in whole or in part, to the landlord's claim that possession should be surrendered because rent is owed." *Curry v. Dunbar House, Inc.*, 362 A.2d 686, 689 (D.C. 1976). However, we connected that term to the more than *de minimis* standard, explaining that, "[s]ince the predominant concern is the habitability of the premises, violations of law which are *de minimis* with respect thereto do not represent a breach of the landlord's obligations." *Id.* at 690.

Although the standardized jury instruction uses the term "substantial violation," it cites *Weintraub*, which does not use that term but rather requires landlords to "comply substantially." *Weintraub*, 458 A.2d at 46. There, we went on to explain "that more than *de minimis* violations of the Housing Regulations are required to establish breach of the implied warranty of habitability." *Id*. at 47 n.5; *see Wright*, 681 A.2d at 1105 ("In order to establish a violation of the warranty of habitability, a tenant must show that any noncompliance with the housing regulations is more than *de minimis*.") (citing *id.* at 47 n.5)).

"more than *de minimis*" housing code violations to breach the warranty of habitability). If conditions deteriorate during the tenancy, both theories may come into play. When housing code violations are more than *de minimis*, the lease itself entitles a tenant to rent abatement under the implied warranty of habitability, but that tenant's lease becomes void if those or additional violations later create unsafe or unsanitary conditions. *See* 14 D.C.M.R. § 302.2.

The second difference is found in the manner of assessing damages. Where a lease is void, the tenant becomes a tenant at sufferance without any contractual obligation to pay rent. *William J. Davis, Inc. v. Slade*, 271 A.2d 412, 416 (D.C. 1970). However, the landlord may recover under a quasi-contract theory by proving "the reasonable value of the premises in its condition as it was when occupied." *Id.* By contrast, a breach of the implied warranty is a breach of the lease agreement, which still remains a valid contract. As a result, "evidence that an apartment is not in good repair . . . is sufficient to allow a jury to find a decrease in the value of that apartment, which would provide a basis for assessing damages." *Cowan v. Youssef*, 687 A.2d 594, 600 (D.C. 1996); *see also Bernstein v. Fernandez*, 649 A.2d 1064, 1072 (D.C. 1991) (concluding that the tenant's "evidence of the problems themselves was enough" for the factfinder to "find that the apartment's 'as is' value was zero, thereby allowing a complete abatement of rent"). Therefore, in an implied warranty setting, the lease agreement is valid, but breached, and the amount of rent

owed is determined by starting with the amount of rent agreed upon and discounting based on the severity of the breaches, as proven by the tenant. *See id.* Unlike with the void lease theory, the burden does not shift to the landlord to prove the value of the rental unit.[3]

We understand the trial court to have concluded that the lease was not void at its inception, but that Mr. Ghaida breached the implied warranty of habitability. Ms. Lynch argues that the court erred: (A) by not holding that the lease was void due to violations of the housing code, and (B) in calculating the amount of rent abatement due for the breach of the implied warranty.

## A.    Void Leases

As discussed above, *Brown v. Southall Realty Co.*, 237 A.2d at 836-37, and 14 D.C.M.R. § 302 establish that a lease: (1) may be void at its inception, or (2) may become void during the tenancy.

---

[3] To the extent that *Chibs*, 960 A.2d at 590, discusses burden shifting in an implied warranty context, that discussion is dictum, as the panel ultimately stated that "we need not decide this issue here." Importantly, however, *Chibs* recognizes that, even in a breach of warranty setting, housing code violations can be so severe that a full abatement of rent is proper. *Id.* ("[E]ven if [the tenant] had the burden of proving that the home had no value, she met that burden.").

## 1.     Was the lease void at its inception?

Ms. Lynch asserts that the trial court erred in not holding that the lease was void from its inception.   She makes two arguments: (1) that the trial court misapprehended the standard for declaring a lease void, and (2) that the trial court's decision not only lacks evidentiary support but was contrary to its own factual findings and other evidence in the record.   We remand for clarification of certain findings related to damage to the roof.[4]

First, Ms. Lynch argues that the trial court misapprehended the law when it characterized *Brown*, and 14 D.C.M.R. § 302.1 as establishing an "extremely demanding standard."   However, this reference by the trial court to a concession made in Ms. Lynch's written closing argument does not persuade us that the court misunderstood the legal standard. *See Wright*, 681 A.2d at 1105 ("[T]rial judges are presumed to know and apply the proper legal standards.").

The tenant has the burden of showing that housing code violations existed.

---

[4] Mr. Ghaida argues that the tenant accepted the property in "as-is" condition. We concur with the trial court that such purported agreements do not absolve the landlord of responsibility for complying with the housing regulations. *See Javins v. First Nat'l Realty Corp.*, 428 F.2d 1071, 1081-82 (D.C. Cir. 1970) ("The duties imposed by the Housing Regulations may not be waived or shifted by agreement if the Regulations specifically place the duty upon the lessor.").

*See Nuyen v. Luna*, 884 A.2d 650, 659 (D.C. 2005) (where tenant was "requesting an abatement of rent from the inception of the tenancy," such abatement "would necessarily be predicated on proof that there were housing code violations [from that point] that rendered the apartment unsafe and unsanitary"). When the record is evaluated, a tenant's delay in complaining about housing code violations can constitute affirmative evidence that those violations were not present at the lease's inception. *See Watson v. Kotler*, 264 A.2d 141, 142 (D.C. 1970).

Applying these standards, the trial court held that Ms. Lynch failed to present enough evidence for it "to make findings necessary to void the lease in its entirety." The court noted that Ms. Lynch's mother, Virginia Moore, who had real estate experience, conducted a walkthrough of the property before Ms. Lynch moved in without identifying any major habitability issues, and there was no evidence of Ms. Lynch making complaints prior to August 30, 2018, which was more than two months after she moved in. We conclude that, if they are not clearly erroneous, these are legally sufficient grounds for finding that Ms. Lynch had failed to carry her burden of proof and that the trial court properly applied 14 D.C.M.R. § 302.1.

Ms. Lynch contends, however, that the record does not support these conclusions. It is true that Ms. Moore cautioned that her walkthrough was "preliminary," and she could only identify problems "visible to [her] eye," but she

acknowledged that, at "the onset of walking in the house," she saw "nothing major" and the house "appeared to be okay," with the exception of some "minor drywall issues."

Additionally, although Ms. Lynch points to Ms. Moore's testimony that she contacted Mr. Ghaida about flooding caused by a leaking roof during the first week of the tenancy, the trial court was not persuaded by the testimony regarding "leaks and flooding." It did not "credit the testimony of [Ms. Lynch] and her mother about the extent of the flooding, which is not corroborated by other evidence." And other record evidence indicates that Ms. Lynch was aware that Mr. Ghaida would be in the process of replacing the roof to address leaks at the time she planned to move in. Indeed, Mr. Ghaida testified that "the roof was replaced and there were no leaks" because it was "a brand new roof" that was "completed before Ms. Lynch actually moved into the property." Nevertheless, the trial court was "reluctant to make any finding solely based on the testimony of either party or Ms. Moor[e]." We understand the trial court to have concluded that, to the extent leaks were present when Ms. Lynch moved in, they did not render the property unsafe or unsanitary.

However, it does appear that the trial court misspoke when it said that "[t]here's no evidence of complaints being made by Ms. Lynch until August of 2018, . . . over two months after [she] moved in." Ms. Lynch points to screenshots

of text messages she exchanged with Mr. Ghaida on June 29, either as she was moving in or shortly thereafter, regarding what the trial court described as an "incident in which a roofing contractor fell through the ceiling and made a hole that was taped up." Several questions remain about the condition of the roof that may bear on the determination of whether the property was unsafe or unsanitary. The record is unclear concerning: whether the foot-through-the-ceiling incident also caused a hole in the roof; when this incident occurred with respect to Ms. Lynch's move-in date; whether or when the roof was repaired; and the extent of the damage caused to the property. On remand, the trial court should clarify these matters and whether they rendered the property unsafe or unsanitary under 14 D.C.M.R. § 302.1.

Apart from evidence about the roof, we therefore conclude that Ms. Lynch has not shown that the evidence required the trial judge to find the lease void at the outset. However, because some key questions about damage to the roof remain unanswered, we remand the issue to the Superior Court for further consideration.

### 2. Did the lease become void during the tenancy?

Although the trial court may have implied that the housing code violations that arose during the term of the lease were not serious enough to render it void under 14 D.C.M.R. § 302.2, it did not refer to that regulation, and we conclude that additional findings are necessary to resolve this issue. *See Wright*, 681 A.2d at 1105.

For example, the trial court noted that the lack of heat renders the property "unlivable" "during the winter." Indeed, Ms. Lynch presented evidence that the lack of heat forced her to move out of the home in December, but the trial court did not determine whether this was true and, if so, whether it rendered the property unsafe or unsanitary or constituted a constructive eviction. Instead, the court calculated that Ms. Lynch was obligated to pay rent (subject to possible abatement) until early April, when Ms. Lynch formally relinquished possession of the property by providing the keys to Mr. Ghaida.

Further, the trial court noted that the property had "a nonworking refrigerator and oven," but the DCRA notice of violation and the testimony of the DCRA inspector appear to indicate that both the stovetop and the oven were not working. Although a nonworking oven alone may not render the unit unsafe or unsanitary, the combination of a nonworking stovetop, oven, and refrigerator in a single family home might make it nearly impossible to store and prepare food in a safe and sanitary manner. Additionally, the trial court found the property had "various issues of integrity of the ceilings and the walls," as well as "water damage," including "significant, not merely cosmetic holes." As discussed in the preceding section, the extent of this damage is unclear, and the trial court did not expressly evaluate whether any damage rendered the property unsafe or unsanitary. Finally, although the trial court concluded that there was "no evidence of mice or other pests before

Ms. Lynch became the tenant,"[5] and she did not complain of mice until she had been living in the house for two months, it did not determine whether the infestation that arose could be attributed to Mr. Ghaida under the housing code[6] and whether it made the property unsafe or unsanitary.

If these violations (or some of them) in fact rendered the property "unlivable," it would seem that they also rendered the house unsafe or unsanitary. If so, the lease would become void at that point, and Mr. Ghaida would have the burden to prove any value of the unit between that time and when Ms. Lynch relinquished possession. *William J. Davis, Inc.*, 271 A.2d at 416. Therefore, we conclude that additional findings are necessary to determine whether and when the violations caused the property to become unsafe or unsanitary. *See* 14 D.C.M.R. § 302.2.

\* \* \*

In sum, we conclude that Ms. Lynch has not shown that the evidence apart

---

[5] Ms. Lynch points to a document in which a previous tenant complained of a rodent infestation, but she has not identified any applicable exception to the rule against hearsay, and we understand the trial court to have concluded that there was no *admissible* evidence of a previous infestation.

[6] Some housing code provisions hold the owner of a rental unit responsible for remedying a mouse infestation, such as 14 D.C.M.R. § 805.3, which states, "[i]f an infestation of a single habitation is caused by failure of the owner or licensee to maintain a residential building in a rodent-proof or reasonably insect-proof condition, the exterminating shall be done by the owner or licensee."

from that related to the roof required the trial judge to declare the lease void at its inception. However, because questions remain about potential damage to the roof of the property at the time the tenancy began, we remand for the trial court to consider whether any damage voided the lease under 14 D.C.M.R. § 302.1. We also remand for further findings clarifying whether the lease was rendered void under 14 D.C.M.R. § 302.2 after the tenancy began. The trial court's findings related to this issue may also impact the implied warranty of habitability analysis discussed below. If, on remand, the trial court finds that the lease became void, the implied warranty of habitability nonetheless would still apply to the time between the lease's inception and the point at which the lease became void, and, for that interim period, the housing code violations discussed in this opinion would constitute breaches of the implied warranty. Even if the trial court concludes that the lease did not become void, it should recalculate the rent abatement due to Ms. Lynch over her entire tenancy for the breaches of the implied warranty of habitability in accordance with the discussion in the next section.

### B. Implied Warranty of Habitability

Ms. Lynch contends that the trial court miscalculated the amount of rent

abatement she was owed under the implied warranty of habitability.[7] She raises two arguments: (1) that the trial court's calculations result from a misapprehension of the law; and (2) that the trial court's findings did not provide adequate support for its award of only a 40 percent abatement. We are not persuaded that the trial court misapprehended the implied warranty of habitability, but agree that the court did not provide adequate findings of fact to support its calculations.

Here, the trial court described what a tenant who claims that her landlord has breached the warranty of habitability must show as follows:

> First, the condition existing at the beginning or arising during the tenancy; Second, the condition constitutes a substantial violation of a specific provision of the housing code; Third, the landlord knew or reasonably should have known of the condition; Fourth, the landlord failed to make repairs in a reasonable time and in a workmanlike manner; Five, that the conditions affected the tenant's use o[r] enjoyment of the premises; and Six, the conditions decreased the value of the tenancy for the tenant. The burden of proof is on the defendant [in this case, Ms. Lynch] as to each element of this defense.

Ms. Lynch claims that the fifth and sixth elements articulated by the trial court reflect a misapprehension of the applicable law. Specifically, she argues that the

---

[7] Ms. Lynch argues that 14 D.C.M.R. § 302.2 sets out the elements of the implied warranty of habitability. However, as discussed in the preceding section, Section 302.2 codifies the principle that a lease may become void after the beginning of the tenancy. The implied warranty is discussed in 14 D.C.M.R. § 301.

trial court should have required Mr. Ghaida to prove the reasonable rental value of the unit notwithstanding the violations. This argument improperly confuses the assessment of damages for a breach of the implied warranty of habitability with the determination of damages when a lease is void. As discussed above, under the warranty of habitability, the burden does not shift to the landlord to prove the value of the rental property; rather, the factfinder may abate the rent owed in proportion to the severity of the breaches, as proven by the tenant. *See Cowan*, 687 A.2d at 600; *Bernstein*, 649 A.2d at 1072.

Ms. Lynch also claims that the fifth and sixth elements identified by the trial court were improperly drawn from nuisance law. We disagree. The trial court's articulation of the elements embodies principles that we have endorsed, although different formulations of the elements may also be correct. The fifth element is an appropriate way to evaluate whether the housing code violations were more than *de minimis*. *See Javins*, 428 F.2d at 1082 n.62 ("the violations must affect the tenant's apartment or common areas which the tenant uses"); *Cowan*, 687 A.2d at 605 (affirming that any housing code violations were *de minimis* where tenants were not "hindered from using their apartments because of the" alleged violations). The sixth element is relevant to assessing the severity of the violations in order to calculate rent abatement. *See Cowan*, 687 A.2d at 605 ("a decrease in the value of that apartment . . . would provide a basis for assessing damages"). Therefore, we

conclude that Ms. Lynch has failed to show that the trial court misapprehended the legal standard for applying the implied warranty of habitability.[8]

Nevertheless, the court did not articulate adequate factual findings to support its calculation of a 40 percent abatement of rent. Although we agree with the trial court that there is "no science" to calculating the proper amount of rent abatement for housing code violations, the court still must provide "sufficient findings of fact and conclusions of law to permit meaningful appellate review." *Wright*, 681 A.2d at 1105 (quotation marks omitted). We have not explained what this means in the context of rent abatement calculations, but the D.C. Rental Housing Commission's regulatory framework provides useful guidance. The factfinder's determination must be supported by satisfactory findings as to the duration, severity, and nature of the housing code violations. *H.G. Smithy Co. v. James C. and Marlene Arieno*, TP 23,329, 1998 DC Rental Housing Comm'n LEXIS 87, at *33-34 (August 7, 1998). And that determination must show a logical connection between the violations and

---

[8] Perhaps the third element (related to the landlord's knowledge of the conditions) requires clarification. "[A]pplication of the implied warranty is contingent upon the tenant's affording the landlord notice of defective conditions and a reasonable time within which to make repairs." *Wright*, 681 A.2d at 1105 (quotation marks omitted). But once the tenant has made this initial showing, the landlord may assert that he did not have notice of a violation as a defense to a claim that he breached the warranty, and the "burden is upon the landlord to show lack of notice." *Weintraub*, 458 A.2d at 49.

the abatement awarded. *Id.* This framework is similar to that set forth in the relevant Standardized Civil Jury Instruction. *See* Standardized Civil Jury Instructions for the District of Columbia, No. 26.05 (rev. ed. 2023) ("You should consider the number, seriousness, and duration of any violation[s] in deciding whether [it/they] justify a reduction in rent and, if [it/they] do, how large a reduction." (brackets in original)).

Here, the trial court sensibly noted that the lack of heat in the home has a variable effect on the value of the unit—meaning that the unit is "unlivable" "during the winter," but it did not state the duration when this was so, or how that duration factored into the ultimate 40 percent calculation. Furthermore, as previously discussed, there was damage to the ceilings and walls (and perhaps the roof) that may affect any calculation of rent abatement and should be clarified on remand. Finally, the trial court noted that two of the violations were "a nonworking refrigerator and oven," but, as noted in the previous section, there is evidence that both the stovetop and the oven were not working. Additional findings are necessary to identify which portions of the stove were not working, and how any related violations of the housing regulations factor into the overall calculation of rent abatement. Therefore, on remand, the trial court should clarify the nature, duration, and severity of each of the housing code violations that contributed to a breach of the implied warranty of habitability.

In sum, we conclude that the trial court's rent abatement calculations did not result from a misapprehension of law, but that certain underlying findings and calculations must be clarified to permit meaningful appellate review.

## IV. Conclusion

For the foregoing reasons, we remand this case to the Superior Court for further consideration, as explained.

*So ordered.*